### In re GILEAD BAPTIST CHURCH OF TAYLOR, Debtor.

**Bankruptcy No. 88–05919–R.**

United States Bankruptcy Court, E.D. Michigan.

Dec. 20, 1991.

David Miller, Southfield, Mich., for Debtor.

Daniel Katlein, Detroit, Mich., for Unsecured Creditors Committee.

## MEMORANDUM OPINION AND ORDER DENYING FEE APPLICATIONS

STEVEN W. RHODES, Bankruptcy Judge.

This matter is before the Court following remand from the District Court with instructions to reconsider this Court's previous denial of the sixth fee application filed by the debtor's attorney and the fifth fee application filed by the attorney for the unsecured creditors' committee. The District Court ordered that these applications should be reconsidered using the lodestar approach.

### I.

#### A.

In reviewing compensation applications, many courts use the approach set forth in

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). In that case, the court identified twelve factors to be considered in awarding fees:

1. The time and labor required;

2. The novelty and difficulty of the question;

3. The skill required to perform the legal services properly;

4. The preclusion of other employment by the attorney due to the acceptance of the case;

5. The customary fee;

6. Whether the fee is fixed or contingent;

7. Time limitations imposed by the client or other circumstances;

8. The amount involved and the result obtained;

9. The experience, reputation, and ability of the attorneys;

10. The undesirability of the case;

11. The nature and length of the professional relationship with the client; and

12. The awards in similar cases.

*Id.* at 717–719.

### B.

■ The fee application in this case is to be reviewed under the lodestar analysis.[1] The starting point of lodestar analysis is multiplying the number of hours *reasonably* expended on the case by a *reasonable* hourly rate. This computation can then be adjusted after considering factors that are not taken into account in determining the hours reasonably expended and the reasonable hourly rate.[2]

### 1. *Hours Reasonably Expended*

■ The purpose of a fee award is to compensate for legal services.[3] Therefore,

the Court must determine the number of hours reasonably expended. In order for a court to make such a determination, the application must document the amount of work performed.[4]

■ However, the amount of time actually expended may not be equivalent to the amount of time reasonably expended.[5] The Court must apply some of the subjective *Johnson* factors to determine the number of hours reasonably expended. *In re Casco Bay Lines, Inc.*, 25 B.R. 747, 755 (1st Cir. BAP 1982). The Court should consider the time and labor required, the novelty and difficulty of the questions presented, the opposition encountered and the amount involved. *Id.* Finally, in *Pilkington v. Bevilacqua*, 632 F.2d 922, 925 (1st Cir.1980), the court held that it should review the work done by the attorney "to see whether counsel substantially exceeded the bounds of reasonable effort."

### 2. *Reasonable Hourly Rate*

■ The reasonable hourly rate is that prevailing in the community for similar work. *Copeland v. Marshall*, 641 F.2d 880, 892 (D.C.Cir.1980); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 718 (5th Cir.1974). There may be more than one reasonable hourly rate for each of the attorneys, and for each of the kinds of work involved in the litigation. 641 F.2d at 892.

■ Determining the reasonable hourly fee in a bankruptcy case also requires consideration of some of the *Johnson* criteria. *In re Casco Bay Lines, Inc.*, 25 B.R. 747, 755 (1st Cir. BAP 1982). The *Casco* court stated that the following *Johnson* criteria require consideration in determining a reasonable hourly fee:

1. The customary hourly fee;

---

1. Lodestar analysis was developed because of the inherent deficiencies of the *Johnson* approach to fee applications. *See In re Casco Bay Lines, Inc.*, 25 B.R. 747, 755 (1st Cir. BAP 1982).

2. *In re Boddy*, 950 F.2d 334 (6th Cir.1991); *In re Manoa Fin. Co., Inc.*, 853 F.2d 687, 691–692 (9th Cir.1988); *Copeland v. Marshall*, 641 F.2d 880, 891 (D.C.Cir.1980). *See also Hensley v. Ecker-*

*hart,* 461 U.S. 424, 433–34, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983).

3. 641 F.2d at 891.

4. *Id.*

5. *Id.* No compensation is due for nonproductive time. *Id.*

2. The level of skill necessary to perform the services;

3. Whether the fee is fixed or contingent;

4. Time limitations;

5. The amount to be obtained;

6. The reputation of the attorneys; and

7. The undesirability of the case.

*Id.*

## C.

■ After the "lodestar" is determined, it may be increased or reduced by reference to factors "which have not *already* been taken into account in computing the lodestar and which are shown to warrant the adjustment by the party proposing it." *In re Bolton Hall Nursing Home,* 40 B.R. 657, 661 (Bankr.D.Mass. 1984), quoting *Miles v. Sampson,* 675 F.2d 5, 8 (1st Cir.1982) (emphasis added). The lodestar can also be adjusted to reflect the "quality of the representation." 40 B.R. at 661. When examining this issue, a bankruptcy court should consider the results of the attorney's participation in the bankruptcy proceeding *and the benefit to the estate* to see if the circumstances warrant adjustment of the lodestar. 40 B.R. at 661, citing *In re Casco Bay Lines, Inc.,* 25 B.R. 747, 756 (1st Cir. BAP 1982) (emphasis added). In *Bolton,* the court stated that adjustments to the lodestar are the exception and not the rule. 40 B.R. at 662, citing *Miles v. Sampson,* 675 F.2d at 8.

In *Matter of Broady,* 92 B.R. 389, 392 (Bankr.W.D.Mo.1988), quoting from 2 *Collier on Bankruptcy* ¶ 330.05, pp. 330–38, 330–39, 330–40 (15th ed.1988), the court stated that "where the quality of the services rendered is poor or the *size of the estate* is insufficient to satisfy the claims of creditors, allowances of compensation should be accordingly reduced." (emphasis added). The court also stated that "[t]he tangible benefit conferred on the estate and its creditors is clearly a proper measure of the appropriate compensation." *Id.*

In *Securities Investor Protection Corp. v. Charisma Sec. Corp.,* 371 F.Supp. 894

(S.D.N.Y.1974), the court held that a "fee allowance ... must bear a sensible and practical relation to the size of the estate, the number of claims involved and the actual services reasonably and necessarily required." *Id.* at 896.

In *Unsecured Creditors' Comm. v. Puget Sound Plywood, Inc.,* 924 F.2d 955, 959 (9th Cir.1991), the court stated that counsel was obligated to consider whether the burden of probable cost of legal services is disproportionately large in relation to the size of the estate and the maximum probable recovery.

■ The basis for considering the size of the estate in determining the reasonable professional fees lies in the very structure and premise of bankruptcy. It is fundamental that the bankruptcy process is for the benefit of the debtor and the creditors, not the professionals. If the fees are not reasonably proportionate to the size of the estate, the benefit shifts, as a practical matter, from the parties to the professionals.

For example, in a Chapter 7 case, if the assets are liquidated and the trustee holds $10,000 in assets, but the professional fees, otherwise reasonable under the lodestar analysis, amount to $20,000, it is clear that awarding such fees would result in nothing for the creditors under 11 U.S.C. § 507(a). It would also be plain that such an estate was administered for the benefit of the professionals, and not for the benefit of the creditors. Similar scenarios can be imagined in Chapter 11. In either event, the Court must examine the reasonableness of fees requested in light of the size of the estate.

## D.

This formulation of the lodestar approach to determine fees was recently approved by the United States Court of Appeals for the Sixth Circuit in the case of *In re Boddy,* 950 F.2d 334 (6th Cir.1991). In this decision, the Court reversed a fee award in a Chapter 13 case that was based solely on the "normal and customary" ser-

vices rendered in such a case.[6] However, the Court went on to state:

> Nevertheless, we do not hold that the bankruptcy court can never consider the "normal and customary" services rendered in a Chapter 13 bankruptcy. The court can legitimately take into account the typical compensation that is adequate for attorney's fees in Chapter 13 cases, as long as it expressly discusses these factors in light of the reasonable hours actually worked and a reasonable hourly rate. The bankruptcy court also may exercise its discretion to consider other factors such as the novelty and difficulty of the issues, the special skills of counsel, the results obtained, and whether the fee awarded is commensurate with fees for similar professional services in non-bankruptcy cases in the local area. In many cases, these factors will be duplicative if the court first determines the lodestar amount because the lodestar presumably subsumes all of these factors in its analysis of the *reasonable* hourly rate and the *reasonable* hours worked. At a minimum, however, the bankruptcy courts must expressly calculate the lodestar amount when determining reasonable attorney's fees.

*Id.* at 338 (citations omitted) (emphasis added).

**6.** The Court concluded that it was an abuse of discretion in awarding fees to consider only the "normal and customary" services, because that practice resembled "the practice of the courts under the pre-Act Bankruptcy Code, when economy of the debtor's estate was a paramount concern." *Id.* at 337. The Court then noted that the legislative history of the present Bankruptcy Code "expressly repudiated" notions of economy of the estate. *Id.* at 337.

This repudiated notion of economy required the Court to award bankruptcy fees at the lower end of the reasonableness scale, and thereby to award fees lower than the fees of privately employed attorneys. This was required in view of the role of the bankruptcy attorney as an officer of the court in assisting with the administration of the estate. See, for example, *In re First Colonial Corp. of America,* 544 F.2d 1291, 1299 (5th Cir.1977).

Nevertheless, considering the size of the case does not reintroduce the repudiated notion of economy. The premise of each is different.

## II.

### A.

■ The hourly rates charged by the attorneys for the debtor are $185 for Earle Erman and $140 for David Miller. The hourly rates charged by the attorneys for the Unsecured Creditors Committee are $155 to $160 for Daniel Katlein.

No one has objected to these hourly rates and they are entirely consistent with rates charged by other Chapter 11 attorneys with similar experience. Accordingly, the Court finds that these hourly rates are reasonable.

### B.

■ In the current fee applications, the attorney for the debtor seeks compensation for 107.4 hours, and the attorney for the Unsecured Creditors Committee seeks compensation for 41.7 hours.

These fee applications also seek awards for fees previously requested but not awarded. In connection with the fifth fee application of the debtor's attorney, the Court awarded $15,241.75 of the $30,252.50 requested for 214.70 hours of service. In connection with the fourth fee application of the attorney for the Unsecured Creditors Committee, the Court awarded $12,299.75 of the $24,599.50 requested for 159.8 hours.[7]

Under prior law, fees were reduced for economy due to considerations of public service and retaining as much of the assets as possible for creditors; under present law, fees might be reduced due to the size of a case in order to obtain a measure of reasonable proportion between the benefit to the creditors and costs associated with that benefit.

Further, the effects of each are different. Whereas consideration of economy resulted in fee reductions in every bankruptcy case under prior law, considerations of size will likely result in fee reductions in few cases.

**7.** At the hearing on those fee applications, the Court awarded one half of the fees requested without prejudice to the applicants' rights to request the fees again in later applications. The Court noted its concern about the mounting professional fees in the case.

All prior fee applications of these attorneys were essentially granted in full; at times, very minor reductions may have been agreed to at the request of the United States Trustee.

No substantial objection is asserted to any of the time records submitted in support of the fee requests, and the Court has reviewed the time records on its own. These records are sufficiently specific and detailed in their descriptions of services. As far as the Court can determine, each of the time entries in each application is by itself reasonable. There is no indication of exaggeration or padding in the records and no suggestion of unnecessary duplication of services. In short, the Court can find none of the traditional grounds upon which fee awards are at times reduced under the lodestar method. Upon examination of the individual time entries, the Court finds that the hours of service entered by these attorneys in their time records were reasonable.

## C.

 As noted above, determining the reasonable hourly rate and the reasonableness of hours expended does not end the inquiry. This Court is obligated to consider whether to adjust this lodestar amount based on other factors that have not already been considered.[8]

In connection with this case, the additional factor that causes concern and that the lodestar calculation does not take into account is whether the total fees requested bear some reasonable relation to the size of the case, and the benefits conferred on the estate by the services.

### 1.

There are many factors by which the "size" of a bankruptcy case can be measured; the most obvious factors are the debtor's assets, liabilities, income and expenses.

In the disclosure statement filed on December 7, 1989, the following information is disclosed concerning the debtor as of August 31, 1989:

The debtor had $172,000 in cash.

The debtor's real property was appraised at $2,750,000–$3,802,500.[9] This property was encumbered by a first mortgage of $796,000, and a series of second mortgages totalling $3,447,000. Thus, depending upon the actual value of the real property, a substantial part of the second mortgage claims will be unsecured under 11 U.S.C. § 506(a).

The other major asset is a secured note which the debtor received in settlement of litigation and which will result in payments to the debtor of $520,000 over nine years plus $275,000 in a balloon payment at the end of nine years.[10] The present value of this receivable is not disclosed, but it is obviously substantially less than the $795,000 total to be received over nine years.

The debtor's unsecured debts were $1,100,000 plus the undersecured portion of the second mortgages.

The debtor's income and expenses from operations have been:[11]

| Year | Income | Expenses |
|------|--------|----------|
| 1987 | $1,076,000 | $1,298,000 |
| 1988 | $1,430,000 | $1,072,000 |
| 1989 | $ 745,000 | $ 760,000 |

---

8. See Part I, C and D, above.

9. These two amounts were determined by two different appraisers.

10. The note calls for a balloon payment of $320,000; $45,000 of that will go to another individual as part of the settlement. The net to the debtor will be $275,000.

11. This information is disclosed in Exhibit A to the Disclosure Statement.

The projected income and expenses from operations are as follows: [12]

| Year | Income | Expenses | Debt Service | Net |
|------|--------|----------|--------------|-----|
| 1990 | $739,000 | $401,000 | $307,000 | $30,000 |
| 1991 | $767,000 | $419,000 | $312,000 | $37,000 |
| 1992 | $797,000 | $437,000 | $317,000 | $43,000 |
| 1993 | $827,000 | $455,000 | $322,000 | $50,000 |
| 1994 | $859,000 | $475,000 | $328,000 | $56,000 |
| 1995 | $893,000 | $496,000 | $334,000 | $63,000 |

### 2.

In a Chapter 7 case, the most important factor in determining the size of the case is the amount of money obtained from liquidating the debtor's assets. The debtor's post-petition income is either non-existent (in the case of a business which has been closed), or unavailable to the estate (in the case of an individual under 11 U.S.C. § 541(a)(6)). The extent and complexity of the liabilities may be a factor, but only to the extent of assets available to pay the claims.

This same analysis would also likely apply in the case of a liquidating Chapter 11 case, where the debts are paid, if at all, by the debtor's assets.

On the other hand, in a Chapter 11 case where the liabilities are paid by the debtor's future income, the Court should also take into account the debtor's future income in considering the size of the case.

### 3.

The total professional fees and expenses that have already been awarded in this case total $488,057.22.[13]

In its present fee application, the law firm representing the debtor requests a total award of $30,872.70. This consists of $14,862.00 in fees plus $768.95 for the time period covered by the present time period, plus $15,241.75 in fees previously requested but not awarded.

The law firm representing the Unsecured Creditors Committee requests a total award of $19,020.75, consisting of $6,721.00 in fees for the time period covered by the present application, plus $12,299.75 in fees previously requested but not awarded.

Accordingly, if the Court grants these fee applications in full, the total professional costs in this case would be $537,950.67. These fees were incurred from approximately September 7, 1988 through July 31, 1990, a period of approximately 23 months. Thus, the professional fees accumulated at an average of approximately $23,000 per month during the case.

### 4.

In 1989, the debtor's average gross income from operations of $62,000 per month

---

**12.** This information is disclosed in Exhibit D-2 to the Disclosure Statement.

**13.** Earle Erman, counsel for the debtor, has been awarded $155,933.30 in fees and expenses.

Dickenson Wright, counsel for the Unsecured Creditors Committee, has been awarded $76,-755.72 in fees and expenses.

Butzel Long, first counsel for the Secured Creditors Committee, has been awarded $38,-060.72 in fees and expenses.

Dougherty & Schneider, second counsel for the Secured Creditors Committee, has been awarded $89,068.77 in fees and expenses.

Zalenko & Associates, accountants for the debtor, has been awarded $25,596.82 in fees and expenses.

Charles Kaye, C.P.A., accountants for the Secured Creditors Committee, has been awarded $13,550.17 in fees and expenses.

Sharon Seal and Claude Wright, secretary and chairman of the Secured Creditors Committee respectively, have been awarded $690.50 in expenses.

Fred Dery, examiner, has been awarded $71,-500 in fees and expenses.

Dean Appraisal Company has been awarded $11,000 in fees.

Norman Levy & Associates has been awarded $901.22 in fees.

Real Estate Professional Services has been awarded $5,000 in fees.

The total of all fees and costs awarded in this case to date is $488,057.22.

was entirely used in operations; in fact, the debtor incurred a net loss of $15,000 for the year. For 1990, the debtor projected a net cash flow of $31,000, or $2,600 per month. For 1995, this amount is projected to increase to $63,000, or $5,300 per month.

Additional monthly income from the debtor's secured note is projected as follows: [14]

| | |
|------|--------|
| 1989 | $1,000 |
| 1990 | $2,000 |
| 1991 | $3,000 |
| 1992 | $4,000 |
| 1993–98 | $5,000 |

Thus, it is clear that the size of this case, as estimated by income, is roughly $4,000 net cash flow per month in 1990, increasing to $10,000 in 1995.

### 5.

These net cash flow amounts establish that the total professional fees in the case are far out of proportion to the size of the case. The accumulation of $23,000 per month in average professional fees during the Chapter 11 case is anywhere from 2 to 6 times the debtor's projected monthly net cash flow.

The same conclusion is reached if the total net income is examined. From 1989 through 1995, the debtor's total projected income from operations is $280,000; its total proceeds from the secured note during this time period will be $300,000. Thus, its total income will be $580,000, but most of that income is dedicated to paying the unsecured claims of over $1,100,000.[15]

### 6.

Apparently recognizing that these fees are out of proportion to the size of the case, the applicants assert a number of special circumstances which, they contend, justify these fees. Specifically, the attorneys for the debtor cite the following in their application, at pages 10–13, paragraph 6:

1. Four groups were opposed to each other and were unwilling to cooperate and compromise.

2. The U.S. Trustee's motion for the appointment of a trustee had to be opposed.

3. The examiner's fees had to be opposed.

4. The examiner's report had to be responded to.

5. The Secured Creditors Committee changed attorneys, and neither attorney participated in formulating the plan.

6. The classes of creditors were themselves split into factions.

7. There was high emotion in the case, in part because the debtor is a church.

The Court has no doubt that these factors impeded the prompt, speedy and efficient resolution of this case; the Court itself witnessed much of these factors at work. The Court has also considered the benefit that the creditors will receive from the 100% plan that was confirmed in this case.[16]

Nevertheless, after giving these factors due consideration, the Court concludes that they simply do not justify the fees requested, given the size of the case. The attorneys for the debtor have already been awarded $155,933.00 in fees and expenses;

---

**14.** The plan dedicates this income to pay 100% of the claims of unsecured creditors.

**15.** Here it is important to note that these conclusions regarding the size of this case cannot come as news to the attorneys for the debtor, or to the attorneys for the Unsecured Creditors Committee. All of this information was available to them throughout the case. They simply must have seen that their fees were mounting beyond the debtor's ability to pay them at or even after confirmation, given the debtor's commitment to its creditors. There can thus be no credible claim that reducing these fees after the work was performed results in unfairness or surprise.

**16.** The Court notes that the debtor's intent, as stated throughout the case, was to pay 100% to its creditors. Thus, the negotiations among the parties focused on the timing of the payments, not the amount.

In this regard, the Court further notes that considerations of "benefit" must be examined in light of the total dollar dividend to creditors, rather than the percentage dividend. For example, if an attorney requests otherwise reasonable fees of $10,000 in a Chapter 11 case where creditors will be paid $5,000, the fees would likely be reduced due to the size of the case and the benefits achieved, whether the dividend constituted 10% or 100% of allowed claims.

the attorneys for the Unsecured Creditors Committee have already been awarded $76,755.77 in fees and expenses. In all good conscience, these are the maximum fees that the Court can conclude are reasonable in the circumstances of this case, unique though they were. No further fees are justified.

The fee applications are denied.

IT IS SO ORDERED.