**In re Adolph JELINEK and Germaine Jelinek, Debtors.**

**In re Leonard JELINEK, Debtor.**

**Bankruptcy Nos. 86–05616, 86–05617.**

United States Bankruptcy Court,
D. North Dakota.

March 1, 1993.

Jon Brakke, Fargo, ND, for Liquidating Agent.

Adolph and Germaine Jelinek, pro se.

Leonard Jelinek, pro se.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The above-captioned cases are Chapter 11 liquidations operating under the terms of confirmed plans proposed by the Federal Land Bank of St. Paul (nka Agri Bank FCB), the principal creditor in each case. Presently under consideration is the appropriate fee to be awarded to Jon Brakke, the attorney who on behalf of FLB crafted the plans and who, subsequent to confirmation,

has acted as attorney for the plans' liquidating agent, Roy Wasche.

In the Adolph Jelinek case Brakke seeks final fees of $22,104.50 together with costs of $1,161.64 for the period February 3, 1992, through case closing (inclusive of a $5,000.00 advance for additional work anticipated beyond November 16, 1992, the last itemized billing date).

In the Leonard Jelinek case Brakke seeks final fees of $11,721.00 together with costs of $274.05 for the period February 5, 1992, through case closing (inclusive of a $3,000.00 advance for additional work authorized beyond November 16, 1992, the last itemized billing date).

The final applications were filed on December 1, 1992, and after one continuance, came on for hearing on January 19, 1993. The several Debtors in pro se responses strenuously object to the applications charging Mr. Brakke to be without authority to act on behalf of the liquidating agent, conflict of interest and lack of substantiation for the amounts requested.

### 1.

Before discussing the applications and the supporting information it is well to recount the procedural history of these related cases since that history in large measure provides a basis for the fees themselves.

Adolph and Leonard are brothers who, since 1942, farmed adjacent tracts in Richland County, North Dakota. Over the ensuing years both farming operations expanded but by 1987 significant yield deficits caused both to experience severe income losses. Neither operation was capable of producing a positive cash flow and on July 17, 1986, both debtors filed for relief under Chapter 11 of the United States Bankruptcy Code. In accompanying schedules Adolph showed assets of $757,000.00 against liabilities of $1,193,000.00 and Leonard showed assets of $744,000.00 against liabilities of $1,047,000.00. Federal Land Bank was the principal secured creditor in the estate with $497,000.00 owing by Adolph and $445,000.00 owing by Leonard. Although both Debtors filed plans of reorganization in January 1987, neither were accompanied by disclosure statements and no effort was made by either Debtor to properly advance their plans to confirmation. Frustrated by nearly two years of delay, FLB on April 11, 1988, filed its own combined disclosure statement and plan in each case. The plans, similar in most essential respects, called for the liquidation of both estates by means of a plan-authorized liquidating agent. On June 3, 1988, FLB amended the plans and a joint confirmation hearing was scheduled for both on August 1, 1988. Faced with liquidating plans, the Debtors in a last minute flurry of activity, hired new counsel who on the very date of the confirmation hearing filed disclosure statements and plans on behalf of the Debtors. At the confirmation hearing both Debtors testified regarding their own intended restructuring but FLB presented very detailed evidence tending to prove that due to grossly inadequate cash flows the Debtors were incapable of reorganizing under any plausible scenario.

The Debtors were unable to overcome FLB's proof and there being no other impediments to confirmation, the two liquidating plans advanced by FLB were confirmed.

Despite the passage of two years from the date of the petition filing to plan confirmation, confirmation itself generated a whirlwind of lengthy and sometimes even obstreperous motions, hearings and adversary proceedings. Both plans called for a liquidating agent to carry out the plan terms by taking immediate title to the estates' respective assets and proceeding to their liquidation in as expeditious a fashion as possible. Although the confirmation of the liquidating plans was affirmed on appeal to the Eighth Circuit Court of Appeals, the rancor did not subside. The Debtors, who by this time, were acting pro se, began to resist all efforts of the liquidating agent to locate and liquidate assets. From August 1988 to the present the Debtors have filed no less than 47 motions and objections of various kinds. These motions, all of which required a response by the liquidating agent and many of which required a hearing, were in addition to the

liquidating agent's own motions incidental to his asset disposition responsibilities.

In carrying out his responsibilities, the liquidating agent conveyed to FLB the bulk of the farmland in each estate in satisfaction of outstanding obligations each of which exceeded the fair market value of the land. He then proceeded to sell the machinery, equipment and grain held by the respective estates as well as several remaining small parcels of farmland. In 1991 the liquidating agent discovered that Florida coastal real estate owned by the Adolph Jelinek estate held substantial value and, after resolving numerous disputes, that land was sold in 1992. Liquidation of assets in both estates is now for the most part complete. Total actual income generated in the Adolph Jelinek estate is estimated by the liquidating agent to be $570,035.00 and in the Leonard Jelinek estate it is estimated at $178,774.00. Both estates have, however, generated huge administrative expenses, inclusive of liquidating agent and attorneys fees, which if allowed in the amounts requested, will fairly well consume the net funds remaining after payment of unsecured creditors. The Adolph Jelinek estate has so far generated $256,813.00 in allowed administrative claims inclusive of federal and state taxes, appraisals, grain storage fees, liquidating agent fees, and attorneys fees. Additional administrative expenses are estimated at $120,330.00 inclusive of $44,568.00 final liquidating agent fees and $23,265.00 final attorneys fees. If the administrative expenses totaling $377,144.00 in the aggregate are paid and the unsecured creditors' claims of $39,169.91 are paid, the estate will be left with $153,720.00 available for distribution to the Debtors.

The Leonard Jelinek estate has so far generated $144,112.00 in allowed administrative claims inclusive of taxes, appraisals, grain storage fees, liquidating agent fees and attorneys fees. Additional administrative expenses are estimated at $13,463.84 inclusive of final liquidating agent fees of $341.81 and final attorneys fees of $11,995.05. If the aggregate administrative expenses totaling $157,586.00 in the Leonard Jelinek estate are paid and the unse-

cured claims of $22,281.47 are paid the estate will be completely consumed and nothing will be left for distribution to the Debtor himself. Administrative claims, if allowed in the amounts requested will consume 66% of the Adolph Jelinek estate and 88% of the Leonard Jelinek estate.

2.

Attorney Jon Brakke began his involvement with these two cases as attorney for FLB and early in their history pursued all the remedies available to a secured creditor under Chapter 11. When, after the passage of two years, there had been little significant progress made by the Debtors towards reorganization, he drafted two comprehensive creditor liquidating plans and prosecuted them through to confirmation and appeal affirmance. For this work he sought and was allowed fees and costs of $3,907.06 from each estate. Upon confirmation the liquidating agent retained Brakke as his attorney in each estate because Brakke was, in his opinion, well acquainted with the cases and competent. From August 22, 1988, through the present, Brakke has ably represented FLB and the liquidating agent through numerous, protracted and often spurious challenges to his authority and method of plan consummation. The record reveals no less than 15 claims-related matters, 10 requests for continuance, 2 show cause requests, 5 requests for stay pending appeal, 5 appeals, 5 discovery-related motions, 4 evictions motions, 4 turnover motions, 13 motions for amendment or vacation of orders, 3 motions for temporary restraining order, 1 motion for contempt, 1 motion to convert, 2 motions to sell real property, 2 claim settlement matters, 1 executory contract matter, 1 motion for withdrawal of reference, 7 fee-related matters, 1 motion for recusal, 1 motion to abandon property, 2 exemption matters, 1 motion for compliance, 1 motion for release of funds and 3 adversary proceedings— each with their own internally generated motions and proceedings.

This litany gives the reader but a glimpse of the litigious nature of these cases made all the more difficult by the Debtors' pro se status.

Since becoming involved in these cases first as attorney for FLB exclusively, Brakke's firm has consumed 296.4 hours on the Adolph Jelinek case and 206.9 hours on the Leonard Jelinek case at professional rates ranging from $110.00 to $135.00 per hour. Initial work done in each case in connection with analyzing the Debtors' prospects for reorganization and advancing FLB's liquidating plans amounted to 32 hours in each case and fees for that work were approved and paid as administrative expenses under section 503(b)(4). The balance of the fees including the two applications presently before the court are likewise based upon section 503(b), rather than section 330. By interim applications submitted in each case, Attorney Brakke has also been previously allowed fees of $17,363.50 plus $2,637.63 for work performed between August 22, 1988, and January 31, 1992, in the Adolph Jelinek case (see Order of September 2, 1992) and fees of $12,314.50 together with costs of $2,587.09 for work performed in the Leonard Jelinek case over the same period (see Order of September 2, 1992). The current applications, final in nature, ask for another $23,266.14 from the Adolph Jelinek estate and $11,995.05 from the Leonard Jelinek estate. Thus, attorney fees and costs total $47,174.33 in the Adolph Jelinek estate and $30,803.70 in the Leonard Jelinek estate.

3.

██ Attorney Brakke as attorney for FLB and the liquidating agent is seeking reimbursement of fees by virtue of his status as attorney for a creditor making a substantial contribution to the respective Chapter 11 cases. FLB, the respective Debtors' principal secured creditor, was successful in achieving confirmation of a liquidating Chapter 11 plan, which, while not agreeable to the Debtors themselves

will ultimately result in full payment of all unsecured claims in the Adolph Jelinek case and a 95% distribution to unsecureds in the Leonard Jelinek case. *See In re 9085 E. Mineral Office Bldg. Ltd.*, 119 B.R. 246 (Bankr.D.Colo.1990). Brakke's work in connection with these cases contributed significantly to these results. Nonetheless, his fee applications under section 503(b)(4) must meet virtually the same criteria as if they were premised upon section 330 with the additional caveat that the applicant must have made a "substantial contribution" to the estate. Section 503 provides in pertinent part:

Allowance of administrative expenses
. . .

(b) After notice and hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including— . . .

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—

(D) a creditor, . . . in making a substantial contribution in a case under Chapter 9 or 11 of this title. . . .

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant.

11 U.S.C. § 503(b)(3)(D) and § 503(b)(4).[1]

██ The foregoing section, incorporating most of the same elements as section 330, authorizes compensation for legal ser-

1. § 330. Compensation of officers.
(a) After notice to any parties in interest and to the United States trustee and a hearing, and subject to sections 326, 328, and 329 of this title, the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—
(1) reasonable compensation for actual, necessary services rendered by such trustee,

examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and . . .

vices rendered by an attorney for a creditor that results in a substantial contribution to the Chapter 11, even if the services coincidentally benefited the attorney's client. *Ex Parte Roberts*, 93 B.R. 442 (D.S.C.1988); *In re W.G.S.C. Enterprises, Inc.*, 47 B.R. 53 (Bankr.N.D.Ga.1985). Whether the compensation sought is reasonable, given the time, nature, extent of the services and the value of the services is always a question of fact for the court. As noted above, this court is satisfied that the services contributed substantially to the estate, since without them, there is no question but what the liquidating plans would never have been proposed or consummated and creditors likely would not have been paid.

■ In considering whether the fees themselves are reasonable, this court regards the "lodestar" analysis as announced by *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) as the appropriate method, although the well known *Johnson*[2] factors are still relevant. *In re Robertson Companies, Inc.*, 123 B.R. 616 (Bankr.D.N.D.1990).

■ The lodestar method simply requires a review of the hours expended and whether those hours were reasonably expended given the nature of the case and a review of the hourly rate charged and whether that hourly rate is reasonable. The lodestar method assumes the attorney has exercised good faith billing judgment and has, prior to submission of the fee statement, eliminated hours that are excessive, redundant or unnecessary. *Hensley*, 461 U.S. at pp. 432–34, 103 S.Ct. at pp. 1939–40.

■ There is nothing from a review of Attorney Brakke's time records when gauged against the litigious nature of these cases that suggests that any of the work billed was unnecessary or excessive. Taken alone, the hours spent appear extreme when one considers the usual time and money invested in a typical Chapter 11 advanced through bankruptcy court in this district. Few Chapter 11's, even those resulting in successful reorganization and having assets many times what is involved in these cases, generated fees of this magnitude. The most analogous case is *In re Yagow*, Bankruptcy No. 85–05257, also a Chapter 11 creditor liquidation where the attorneys fees totaled $38,000.00. But that case while the most analogous, by no means engendered the plethora of litigation that the Jelinek cases did—and that's the difference.

In assessing the worth or value of professional services to an estate, the notion of economy has been all but rejected by most courts except in the instances where trustee's fees are an issue. Nonetheless, some courts still adhere to the view that, despite excellent work and results, professional compensation still must bear some relationship to the size of the estate. *See In re Kornstein's*, 56 B.R. 481 (Bankr.R.I. 1985)—where the court said the spirit of economy is still a factor since bankruptcy was designed for relief of debtors not the benefit of attorneys. *See also, In re Schumann Tire & Battery Co., Inc.*, 89 B.R. 223 (Bankr.M.D.Fla.1988). Perhaps the strongest pronouncement in favor of invoking an economy factor is the case of *In re Gilead Baptist Church of Taylor*, 135 B.R. 38 (Bankr.E.D.Mich.1991) in which the bankruptcy court severely reduced the attorney fee application believing the burden of them bore little relationship to the size of the estate. The court opined, "the basis for considering the size of the estate in determining the reasonable professional fee lies in the very structure and premises of bankruptcy. It is fundamental that the bankruptcy process is for the benefit of the debtors and the creditors, not the profes-

---

**2.** This court has in past cases analyzed attorney fee applications by reference to the 12 point criteria set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). The 12 factors are: (1) the time and labor required; (2) novelty and difficulty of the issues; (3) skill required; (4) preclusion of other employments; (5) customary fees; (6) whether the fee is fixed or contingent; (7) time pressures; (8) amount involved and results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; (12) awards in similar cases.

sionals. If the fees are not reasonably proportionate to the size of the estate, the benefit shifts, as a practical matter, from the parties to the professionals." The foregoing is a pithy comment and has much to commend it particularly when the reality of a family farmer about to lose nearly everything tugs at one's sense of equity and sentiment. This court has spent considerable time mulling over the question of whether there is or can be any consideration for an economy element even where all the *Johnson* factors as ensconced in the lodestar approach are satisfied and concludes there cannot. First of all, the *Gilead* case was reversed by the district court which restored all the requested fees. *In re Gilead Baptist Church of Taylor, Inc.*, 806 F.Supp. 644 (D.E.D.Mich.1992). Secondly, our own circuit in the case of *In re Apex Oil Co.*, 960 F.2d 728 (8th Cir.1992), has held that the lodestar calculation once made already is reflective of the novelty and complexity of the issues, the skill and ability of counsel, the quality of representation and results. An economy factor was not noted to be a consideration. The circuit specifically noted that Congress intended that attorneys engaged in bankruptcy practice be paid at a rate commensurate with non-bankruptcy services.

The Jelinek cases while having their start as typical Chapter 11's, became something far different. Liquidating Chapter 11 farm plans are themselves rare but when coupled with the degree of litigious conduct generated by the Debtors themselves, they took on a character which cannot be compared to any other Chapter 11. These cases could have and should have been wound up years ago with minimal attorney time or fees. As one court noted, "it is particularly inappropriate for the debtor to complain about the substantial expenditure of time and money ... when the problem is one of the debtor's own making." *Ex Parte Roberts, supra* at p. 445. Had the Jelineks been cooperative in assisting with plan consummation and had they not thrown up litigious road blocks at every step of the proceedings the administrative expenses including the attorneys fees now requested would have been far

less. Something about the size of the fees still bothers the court, yet there is no obvious unreasonable billing here and to simply cut the fees based upon a feeling that more money should be returned to the Debtors, would require an arbitrary application of the disreputed economy criteria which as we have seen has no remaining basis in law (except in the case of trustee's fees).

4.

The Debtors have made much of the fact that neither the liquidating agent nor Attorney Brakke ever applied to the court for an order authorizing Brakke's employment. Reliance is placed upon section 327 and Rule 2014, both of which clearly and unambiguously require prior court approval for the employment of professional persons. These two provisions, however, are directed towards persons employed by a Chapter 7 trustee, a Chapter 11 debtor in possession or persons who are employed by a trustee under section 1107. Cases discussing the prior approval requirement do so in the context of a *debtor's* counsel who failed to obtain prior approval but who later seeks a fee award pursuant to section 330 and administrative expense treatment pursuant to section 503(b)(2). *E.g., In re Hazen Agr. Product Service, Inc.*, 109 B.R. 602 (Bankr.W.D.N.Y.1990). In the case at bar, Attorney Brakke was never employed by the Debtors nor by a trustee pursuant to section 1107, rather he at all times served as attorney for the principal creditor, FLB and the plan-constituted liquidating agent. His fees are for work done in achieving consummation of FLB's plan in each case and as such are premised not upon section 503(b)(2) but instead upon section 503(b)(3) which allows a creditor or an attorney performing services for a creditor to recover actual and necessary costs including professional fees. Although an argument can be made for the necessity of advance employment approval of a professional employed by a creditor, neither Rule 2014 nor section 327 explicitly require it and this court does not see the logic in such a requirement since any professional fee request made under section 503(b)(4) for services rendered in connection with the

prosecution of a creditor's plan must meet the "substantial contribution" test. In fact, there is only one subsection of section 503(b) that explicitly requires prior employment approval and that is section 503(b)(3)(B). From this it is reasonable to conclude that Congress intended that professionals seeking compensation pursuant to section 503(b)(3)(D) and 503(b)(4) need not apply for nor obtain prior court approval. *See In re Washington Lane Associates*, 79 B.R. 241 (E.D.Pa.1987).

In sum, the final fees requested by Attorney Jon Brakke are reasonable in terms of hours spent and rate charged. They resulted in a substantial contribution to the estate and accordingly, are allowed in the sums prayed for in the case of Adolph Jelinek and Germaine Jelinek, Bankruptcy No. 86–05616 and in the case of Leonard Jelinek, Bankruptcy No. 86–05617.

**SO ORDERED.**