### In re PRIMARY HEALTH SERVICES, INC., Debtor in Possession.

#### Bankruptcy No. 96–53104.

United States Bankruptcy Court, N.D. Ohio, Eastern Division.

Feb. 13, 1998.

Stephen Hobt, Cleveland, OH, for Debtor.

Michael Tucker, Cleveland, OH, for Creditor.

## ORDER GRANTING MOTION FOR ATTORNEY'S FEES AND COSTS

MARILYN SHEA–STONUM, Bankruptcy Judge.

This matter came before the Court on Daniel J. Stypula's motion for attorney fees and costs, the response of the United States Trustee, and the Debtor in Possession's objection. A hearing was held on this matter on November 4, 1997. Appearing at the hearing were Michael Tucker, counsel for the movant, and Stephen Hobt, counsel for the Debtor in Possession ("DIP"). The Court heard the testimony of Daniel J. Stypula and Arthur W. Chandler. In deciding this matter, this Court considered their testimony, the exhibits admitted during the hearing and the post-hearing accounting filed by the DIP.

**1.** Primary Health Services, Inc. is an Ohio corporation wholly owned by the Chandler Group, Inc. The Chandler Group, Inc., an Ohio Corporation which owns nine other entities, is wholly owned by Arthur W. Chandler.

## I. JURISDICTION

The matter before the Court is a core proceeding as it involves a determination regarding the allowance of attorney's fees and costs as an administrative claim against the estate. 28 U.S.C. §§ 157(b)(2)(A) and (O). This Court has jurisdiction to enter a final order in this matter pursuant to 28 U.S.C. § 157(a) and (b)(1) and the Standing Order of Reference entered in this District on July 16, 1984.

## II. UNDISPUTED FACTS

On December 26, 1996, Primary Health Services, Inc.,[1] filed a petition for relief under Chapter 11 of the Bankruptcy Code. The DIP's schedules, filed on January 10, 1997, listed Daniel J. Stypula as the only secured creditor. Additionally, the DIP listed $47,468 in unsecured priority claims and $180,914.39 in unsecured non-priority claims, $143,388 of which was listed as owing to the Chandler Group. Six days later the DIP filed amended schedules which listed the unsecured non-priority claims at $218,260.16, $143,388 of which was listed as owing to the Chandler Group.

Prior to filing a petition for relief under Chapter 11 of the Bankruptcy Code, the debtor[2] and Daniel J. Stypula entered into an employment arrangement which eventually gave rise to state court litigation between Stypula and the debtor. A judgment was rendered in favor of Stypula and against the debtor in the amount of $1,350,000 in August 1996 and prejudgment interest was awarded to Stypula in December 1996. The judgment was appealed by both Stypula and the DIP.

After the entry of the judgment by the state court, Mr. Stypula began the process of attempting to collect on the judgment. On September 23, 1996, Mr. Stypula filed a creditors' bill naming four defendants which represented approximately 10 percent of the debtor's total business. Thereafter, Mr. Stypula filed another creditor's bill on December

**2.** The phrase "debtor" as used herein refers to Primary Health Services, Inc. prior to its Chapter 11 filing.

18, 1996 naming over 60 creditors of the debtor.

During the four month period prior to its Chapter 11 filing, the debtor transferred certain assets to its parent and sister companies. By way of example, the debtor transferred ownership of eight automobiles to the Chandler Group, Inc. Chandler Group, Inc., did not pay any money to the debtor for those cars; rather, after the transfer the debtor's books listed a $95,000 account receivable in respect of that transaction. The debtor's September 30, 1996 balance sheet, however, showed those cars as having a net value after depreciation of $218,875.84. Stypula Exhibit A ("SX A"). At the hearing Arthur Chandler testified that the cars were transferred from Primary Health Services to the Chandler Group in order to consolidate assets in the "umbrella" group and allocate them down to other entities.

In addition, the debtor made several fund transfers to the Chandler Group and two other Chandler Group entities in 1996 prior to its Chapter 11 filing. The debtor transferred $1,031,426.40, in total, to the Chandler Group, $851,426.35 of which was transferred after the state court judgment was rendered. SX C. The debtor also transferred approximately $75,000 to two Chandler Group entities after the state court judgment. SX C. In contrast, only one transfer was made to the debtor from the Chandler Group during 1996. That transfer, made on December 2, 1996 in the amount of $380,523.59, was made for the purpose of providing the means for PHS to pay its employee bonuses. *See* SX B and SX C.

The statement of financial affairs filed by the DIP on January 10, 1997 and signed by Arthur Chandler did not provide much information about the pre-filing financial affairs of the DIP. In response to the request for a listing of all payments made within one year prior to the commencement of the case to insiders, the DIP responded, "various payments made upon short term borrowing during various periods during the year prior to the filing of the petition." In addition, the DIP provided an incomplete answer to question number 10 regarding transfers of property, not in the ordinary course of business, within one year prior to the commencement of the case. The DIP simply wrote that the debtor transferred automobiles with a value of $200,000 to the Chandler Group, Inc. on October 1, 1996. In retrospect, this further suggests that Arthur Chandler was go attempting to prevent or delay the disclosure of as much information about the financial status of the DIP for as long as he could.

After making an election to be treated as a "small business" debtor pursuant to 11 U.S.C. §§ 101(51)(C) and 1121(e), the DIP filed a Plan of Reorganization and a Disclosure Statement on April 14, 1997. That plan defined seven classes of claims and one class of interests.[3] The plan characterized Classes 1–4 and 8 as not being impaired and stated that no money was owed to Class 2 or 4. Class 5, unsecured creditors, excluding Mr. Stypula, were to be paid 100 per cent plus interest over a three month period from the effective date of the plan and were categorized by the DIP as impaired. Mr. Stypula's claim, the only claim in Class 6, was to be paid over a period of three years from an escrow account to be funded after the payment to the holders of class 5 claims.

Mr. Stypula filed an objection to the DIP's proposed Disclosure Statement raising the issue of artificial impairment of Class 5 claims. As a result, the DIP filed an Amended Disclosure Statement and Plan on May 21, 1997. The Amended Plan reduced the length of time it would take to fund the escrow account from which Mr. Stypula's claim would be paid from three years to 18 months, with the claim to be paid from the account on the date on which the state court judgment became final and not subject to further appeal. On June 30, 1997, the DIP filed a Third Amended Plan which proposed to pay Mr. Stypula's claim from an escrow account which would be fully funded on the effective date. Mr. Stypula filed an objection to this plan questioning its feasibility and again raising the issue of artificial impairment. No

---

**3.** Class 1: Administrative Expenses; Class 2: Wage Claims; Class 3: Taxes; Class 4: Executory Contract Claims; Class 5: Unsecured Claims Excluding Stypula; Class 6: Stypula's Claim; Class 7: Insider Claims; Class 8: Shareholder Claims.

other creditor submitted a ballot accepting or rejecting the plan.

At the hearing to consider confirmation of the DIP's plan as amended on August 19, 1997, the Court noted the lack of participation by all creditors, except Mr. Stypula. At that point, the DIP's counsel informed the Court that all unsecured creditors, except Mr. Stypula, had been paid **post-petition**, without Court authority, by other Chandler Group, Inc. entities. He represented that he had learned of these payments only a few days prior to that hearing.

Recognizing that the funding of the escrow pursuant to the plan created a mechanism to secure payment of his judgment if affirmed on appeal, Mr. Stypula withdrew his objection and his counsel requested that this Court retain jurisdiction to hear a motion for payment of Mr. Stypula's attorney's fees and costs by the DIP. The Court granted leave to Mr. Stypula to file a motion for payment of attorney fees and costs and confirmed the plan. The Court explicitly did not, however, make a finding of good faith beyond that which was required in order to reach the just result in that unusual context. Thus, the Court is not bound by that finding for the purposes of the motion currently pending before it.

The evidence presented at the hearing on Mr. Stypula's motion for payment of fees and costs revealed that the DIP had sought to make itself uncollectible by transferring assets to the other Chandler Group, Inc. entities, had filed for protection under the Bankruptcy Code rather than posting a supersedeas bond and to delay payment of the state court judgment, and that the responsible party for the DIP had caused to be paid all of the DIP's unsecured creditors, except Mr. Stypula, **post-petition** purportedly with funds of Chandler Group, Inc.

Mr. Chandler testified that despite having been told by his counsel not to pay any pre-petition bills post-petition without the authority of the Court, he ordered the payment of some pre-petition debts on or about June 3, 1997, post-petition, because "things were falling in." He further testified that he did not recall ordering any other similar payments. Rather, Mr. Chandler related a story about his cellular phone being turned off while he was engaged in conversation on that phone because of monies owed to GTE Mobilnet by the debtor. When questioned about the lack of an entry reflecting payment to GTE Mobilnet on or about June 3, 1997, Mr. Chandler testified that all creditors of the DIP were paid whether listed on June 3, 1997 payment register or not.

At the hearing, the Court instructed the DIP to file an accounting listing all post-petition payments made by Arthur Chandler or any Chandler Group entity to any pre-petition creditor of the DIP. That accounting was filed on January 7, 1998. Mr. Stypula filed his response on January 21, 1998. That accounting detailed payments made not only by the DIP's parent and sister companies to pre-petition creditors of the DIP, but also by Primary Health Services, Inc., the DIP itself. Over 95% of the DIP's pre-petition debt was paid after the case was filed but prior to June 3, 1997, even though the plan was not confirmed until August 19, 1997. Over 60% of those payments made were made by the DIP. In particular, the register reflects a payment in the amount of $2,850.79 made to GTE Mobilnet on February 20, 1997 by the Chandler Group, Inc., nearly four months earlier than the date which Mr. Chandler testified was the date that he ordered the payment of that bill. This Court finds that his testimony was either knowingly incorrect or carelessly uninformed.

Because the DIP made a small business election at the outset, and accordingly no creditor's committee was organized or appointed in this case, these facts would not have come to the attention of the Court absent the contribution made by Mr. Stypula and his counsel throughout this case. The DIP failed to reveal these payments in any of the operating reports or the various drafts of disclosure statements filed in this so case. Additionally, even through the hearing of the motion for payment of attorney's fees and costs, the responsible party continued to attempt to conceal the scope and timing of these payments.

From the outset, Mr. Stypula's contribution in this case has been consistent. His objection to the motion of the DIP to use cash collateral raised issues concerning the DIP's good faith. Similarly, those issues were raised again by Mr. Stypula in his objections to the DIP's disclosure statement and plan, along with the allegation that the DIP filed for relief under Chapter 11 of the Bankruptcy Code only to avoid paying the state court judgment against it for as long as possible.

## III. LAW

The issue before the Court is whether counsel for an individual creditor who essentially performed the functions of an official creditors' committee in a small business Chapter 11 is entitled to a recovery of counsel fees and costs pursuant to 11 U.S.C. §§ 503(b)(3)(D) and (b)(4) or, in the alternative, as a sanction against the DIP for its bad faith and abuse of the bankruptcy process.

■■■ The actual, necessary expenses incurred by a creditor who makes a substantial contribution in a case under chapter 11 of the Bankruptcy Code shall be allowed as administrative expenses after notice and a hearing. 11 U.S.C. § 503(b)(3)(D). In particular, compensation for legal services rendered by an attorney for a creditor is authorized by 11 U.S.C. § 503(b)(3)(D), notwithstanding that the legal services benefitted the attorney's client, if the services resulted in a substantial contribution to the chapter 11 estate. *See In re Jelinek*, 153 B.R. 279, 283–84 (Bankr. D.N.D.1993); *In re W.G.S.C. Enterprises, Inc.*, 47 B.R. 53 (Bankr.N.D.Ga.1985). "Substantial contribution" is not defined in the Bankruptcy Code. Courts have hesitated to find that a creditor has made a substantial contribution except on those "rare occasions when the creditor's involvement truly fosters and enhances the administration of the estate." *In re Alumni Hotel Corporation*, 203 B.R. 624, 630 (Bankr.E.D.Mich.1996) *citing In re D.W.G.K. Restaurants, Inc.*, 84 B.R. 684, 690 (Bankr.S.D.Cal.1988). Courts have articulated several concepts which provide some guidance as to whether the present situation is one of those rare occasions. The DIP's unilateral and unauthorized actions

that transformed this case into literally a one creditor case call for some tailoring of those concepts, i.e., whether the applicant's services were rendered solely to benefit his client or to benefit all parties in the case; whether the services provided a direct, significant, and demonstrable benefit to the estate; and whether the services duplicated those provided by DIP counsel or the committee of unsecured creditors counsel. *Id.* at 631; *In re Jack Winter Apparel*, 119 B.R. 629, 633 (E.D.Wis.1990). In addition, the services provided must have resulted in a tangible, positive benefit for the estate. *Id.* at 632; *In re Envirodyne Industries, Inc.*, 176 B.R. 815, 819 (Bankr.N.D.Ill.1995).

■■ The creditor seeking to recover the actual and necessary expenses incurred carries the burden of persuading the Court that the services rendered resulted in a substantial contribution to the estate. *See In re Alumni Hotel Corporation*, 203 B.R. at 630 (Bankr.E.D.Mich.1996); *In re Jack Winter Apparel*, 119 B.R. 629, 632 (E.D.Wis.1990). If the creditor presents a *prima facie* case, the burden of production shifts to the debtor/objector. *In re Jack Winter Apparel*, 119 B.R. at 632 (E.D.Wis.1990).

■■ As to the third factor, whether the services duplicated those provided by attorneys for the DIP or the committee of unsecured creditors, no committee of unsecured creditors was created and the responsible person for the DIP chose to leave the DIP counsel uninformed of these events until the eve of the confirmation hearing. In essence, Mr. Stypula's counsel acted as counsel for a creditor's committee by investigating the DIP's conduct of the business in both pre- and post-filing time frames. In performing many of the same functions that a creditors' committee would, counsel for Mr. Stypula satisfied the first and second factors as well.

The services rendered by counsel for Mr. Stypula provided a direct, significant and demonstrable benefit to the entire bankruptcy estate, not just to Mr. Stypula. The unrefuted evidence presented at the hearing established that the DIP was engaged in a continuing abuse of the bankruptcy process and demonstrated the contempt of the DIP

for the automatic stay behind which it hid as it found convenient. In addition, the evidence showed that pre-petition the debtor engaged in an attempt to make itself uncollectible and incapable of posting a supersedeas bond by transferring over $900,000 from its accounts to its parent or sister companies during the four months prior to filing. The exposure of this course of conduct strongly supports Mr. Stypula's assertion that the DIP filed only to avoid posting the supersedeas bond and to postpone payment of the state court judgment for as long as it could mislead this Court. Counsel for the DIP argued that part of the monies transferred were for payment by the Chandler Group of taxes due and owing by the DIP as a result of paying employee bonuses. However, the transfers were never as large pre-state-court-judgment as they were post-state-court-judgment despite the awarding of larger bonuses to employees in pre-state-court-judgment years.

The Court will not recite now each manipulation by the DIP which would have been obscured from the Court's view but for the diligent efforts of counsel for Mr. Stypula in performing the functions normally associated with a creditors' committee in a Chapter 11 case.[4] However, in the event of an appeal of this Court's decision, the Court reserves the right to further detail those facts and the efforts of counsel for Mr. Stypula to unearth the true facts in this case in a separate filing.

■ Counsel for Mr. Stypula also argued that the Court should grant his motion for payment of attorney's fees and costs based on the DIP's bad faith pursuant to Bankruptcy Rule 9011 and, in general, as a sanction. Although the Court rests its decision on 11 U.S.C. § 503, the result is also a proper award of attorney's fees and costs to the movant in light of the DIP's bad faith.

■ A lack of good faith in filing a petition for relief under Chapter 11 of the Bankruptcy Code may give rise to sanctions, including the award of attorney fees or the dismissal of the case. *In re Marsch*, 36 F.3d

825 (9th Cir.1994). Good faith depends on the balance of many factors used to determine "whether a debtor is attempting to unreasonably deter and harass creditors or attempting to effect a speedy, efficient reorganization of a feasible basis." *Id.* at 828. The evidence in this case clearly established that the debtor did not have a real cash flow problem before it entered into bankruptcy. Rather, the DIP was desirous of avoiding or unreasonably delaying payment either of a supersedeas bond or the state court judgment and filed for relief under Chapter 11 to accomplish that end.

The question, then, is whether against this factual background filing a petition for relief under Chapter 11 for the purpose of avoiding or delaying payment of a supersedeas bond or a state court judgment is proper or is in good faith. Courts have drawn a distinction between those cases where a "solvent sole proprietor with a single judgment creditor files ... and a multinational manufacturer faced with mass tort litigation from a sizeable segment of the consumer public." *In re Smith*, 58 B.R. 448, 450 (Bankr.W.D.Ky. 1986).

> The great majority of courts, however, have generally found that a debtor abuses the bankruptcy process when it files a bankruptcy petition in lieu of filing a supersedeas bond in an effort to avoid the consequences of an adverse state court decision.

*Mueller v. Sparklet Devices, Inc. (In re Sparklet Devices)*, 154 B.R. 544, 548 (Bkrtcy. E.D.Mo.1993). If mass tort litigation is not involved, the ability of the debtor to continue to operate or remain solvent during the payment of the judgment against it is decisive. *See, Id.; In re Holm*, 75 B.R. 86 (Bankr. N.D.Cal.1987). The evidence presented to the Court proves that the debtor transferred assets away from itself to its parent company for the purpose of making itself uncollectible. Absent the transfers made by the debtor after the state court rendered its judgment, the debtor would have remained solvent

---

4. The DIP has already usurped judicial resources through its inappropriate filing, and there is no reason at this time to compound that usurpation.

while posting a supersedeas bond or paying the judgment against it.

In addition, the debtor manufactured cash flow problems in order to prevent this Court from discovering the DIP's abuse of the process. One indication of that manufacturing is that the pre-petition debts listed on the debtor' schedules are for services rendered the month prior to filing the petition. All of those unsecured creditors listed in the schedules, except for Mr. Stypula, were paid by the DIP or its related companies shortly after the filing of its petition. Finally, with the prospect of a credible competing plan developing, in the short time span of less than 60 days, the DIP was able to shorten the length of time for payment of Stypula's claim from over three years to 40 days. The debtor in possession filed this petition for an improper purpose and engaged in a continuing course of deception. The Ninth Circuit has awarded attorney fees for such manipulation and deception. *In re Marsch,* 36 F.3d 825.

█ In addition, Bankruptcy Rule 9011 allows for the recovery of attorney fees upon the violation of that rule from the attorney[5] or the client. Bankruptcy Rule 9011(a). This rule requires that any document filed in a bankruptcy case shall be

> well-grounded in fact and [be] warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation or administration of the case.

Bankruptcy Rule 9011(a). Essentially, this presents a two part test for determining the appropriateness of awarding sanctions. *See In re Marsch,* 36 F.3d 825, 829 (9th Cir. 1994). First, a court must determine whether the document is well grounded in fact. Second, the court must determine if the pleading was "interposed for any improper purpose." *Id.*

The first question that the Court must answer is whether at the time of signing the document, did the signers hold a reasonable belief in the veracity of the documents. *See Mapother & Mapother, P.S.C. v. Cooper (In re Downs),* 103 F.3d 472, 481 (6th Cir.1996). The documents filed with the Court in this case were not well grounded in fact, the evidence has revealed that the list of creditors was manufactured and that the real pre-petition debts, except for the judgment held by Mr. Stypula, were paid post-petition without the authority of this Court. Yet, the DIP's amended schedules, plan and disclosure statements do not mention those payments. As to whether the signer of those documents or the represented party held a reasonable belief as to the veracity of any documents filed with the Court at the time of signing, the evidence revealed that Arthur Chandler paid the pre-petition debts of the DIP after the filing date but mostly prior to June 3, 1997. The DIP's amended plan and disclosure statements were filed after June 3, 1997 and were signed by Arthur W. Chandler. Thus, the Court finds that the DIP's position was not well grounded in fact.

Secondly, as discussed above, the DIP filed various documents before this Court, in particular the petition, for the improper purpose of avoiding the payment of a state court judgment or the posting of a supersedeas bond. Having established that sanctions are appropriately assessed against the DIP, the movant is entitled to recover its attorney fees and costs that were made necessary only by the DIP's manipulation of the process.

Additionally, many of those documents were signed by Arthur W. Chandler, the responsible person for the DIP. Bankruptcy Rule 9011 provides that "[i]f a document is signed in violation of this rule, the court . . . shall impose on the person who signed it, the represented party, or both, an appropriate sanction." Courts have found the principal in a closely-held corporation who signs a document, although in his official capacity, or causes a false or misleading document to be filed in bad-faith personally liable for Rule

---

5. The manipulations in this case appear to have been the actions of the client, apparently acting in direct and undisclosed disregard of counsel's advice. It is unclear when DIP counsel learned of the debtor's pre-petition transfers. In any event, the entity whose conduct demands sanction in this instance is the client and its responsible person, but not its counsel.

9011 sanctions. *See In re Memorial Estates, Inc.,* 116 B.R. 108 (N.D.Ill.1990); *Midwest Properties No. Two v. Big Hill Investment Co.,* 93 B.R. 357 (N.D.Tex.1988); *In re D & V Construction,* 150 B.R. 362 (Bankr.W.D.Pa. 1993); *County of Chesterfield v. Tamojira, Inc.,* 197 B.R. 815 (Bankr.E.D.Va.1995); *accord, Jones v. Bank of Santa Fe (In re Courtesy Inns, Ltd. Inc.),* 40 F.3d 1084 (10th Cir.1994); *In re Rainbow Magazine, Inc.,* 136 B.R. 545 (9th Cir. BAP 1992) *on appeal after remand* 77 F.3d 278, 282 (9th Cir.1996) (holding that Rule 9011 allows a bankruptcy court to sanction attorneys, parties, and individuals that sign and file false documents in bad-faith with the court); *but see In re Chisholm Co.,* 166 B.R. 706 (D.Colo.1994). Arthur Chandler, the principal shareholder of the Corporate parent of Primary Health Services, Inc. is the responsible party for the DIP.

As the responsible party for the DIP, Arthur Chandler signed many of the papers filed in this case. Additionally, Mr. Chandler's examination revealed that in direct contravention of what he understood to be a prohibition against paying the debts of Primary Health Services, Inc., during the post-petition period, he ordered that those debts be paid. The evidence also supports the inference that Mr. Chandler ordered those debts to be paid to protect himself, the indirect sole shareholder, from the impending filing of a competing plan of reorganization. Mr. Chandler had personal knowledge of these events and was directly involved in all of them, including the pre-petition, post-state-court-judgment transfers of assets of the debtor to its parent and sister companies.

Therefore, having established that the filing of this bankruptcy petition was in bad faith and that Arthur Chandler had personal knowledge of the bad faith and was, in fact, the person who orchestrated the manipulation and deception of the bankruptcy process, a sanction against the responsible party for this closely-held corporation, Arthur Chandler, is appropriate.

For the above mentioned reasons, the motion of Mr. Stypula is granted. Arthur Chandler and Primary Health Services, Inc. are jointly and severally liable for the full amount of attorney's fees, $30,040.00, and costs, $381.18, sought by Mr. Stypula in his motion for payment of attorney's fees and costs. Among the rights that counsel for Mr. Stypula has in this regard is the right to be paid in full as a Class 1 administrative expense claim pursuant to the terms of the DIP's confirmed plan.

**IT IS SO ORDERED.**