**In re NARRAGANSETT CLOTHING COMPANY, Debtor.**

**Bankruptcy No. 90–10149.**

United States Bankruptcy Court, D. Rhode Island.

Nov. 4, 1993.

---

Whitton E. Norris III, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for trustee.

Joseph B. Garb, Post–Confirmation Trustee, Wellesley, MA.

Joseph M. DiOrio, Hinckley, Allen & Snyder, Providence, RI, for Official Unsecured Creditors' Committee.

Allan M. Shine, Winograd, Shine & Zacks, P.C., Providence, RI, for debtor.

John V. Snellings, Peabody & Brown, Boston, MA, for Signal Capital Corp.

## DECISION AND ORDER

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

Heard on March 23, 1993, on the fourth of a series of fee applications in this liquidating and professionally beleaguered Chapter 11 case. To date, the following fees and expenses have been paid to professionals:

|  |  |  | FEES | EXPENSES |
|---|---|---|---|---|
| 10/25/90 | J. Garb | Trustee (148) | $ 100,000. | $ |
| 03/28/91 | J. Garb | Trustee (245) | 195,000. | 5,093. |
| 03/26/92 | J. Garb | Trustee (245) | 25,000. | |
| 03/26/92 | J. Garb | Trustee (405) | 80,000. | 2,418. |
| 02/10/92 | C. Hahn | Accountant (337) | 10,000. | |
| 04/14/93 | C. Hahn | Accountant (479) | 2,000. | |
| 03/28/91 | W. Norris | Trustee's atty (246) | 235,000. | |
| 03/26/92 | W. Norris | Trustee's atty (267) | 10,000. | 28,000. |
| 03/26/92 | W. Norris | Trustee's atty (390) | 200,000. | 15,000. |
| 03/28/91 | A. Shine | Special counsel (248) | 95,000. | |
| 03/28/91 | A. Shine | Debtor's atty (249) | 85,000. | |
| 03/26/92 | A. Shine | Special counsel (406) | 14,992. | |
| 11/09/92 | A. Shine | Special counsel (248) | | 5,898. |
| 11/09/92 | A. Shine | Debtor's atty (406) | | 1,753. |
| 11/09/92 | A. Shine | Special counsel (249) | | 2,728. |
| 03/28/91 | M. Silverstein | Cred.Comm.atty (247) | 70,000. | |

| 03/26/92 | M. Silverstein | Cred.Comm.atty (401) | $ 29,186. | $ 4,096. |
|---|---|---|---|---|
| 03/26/92 | M. Silverstein | Cred.Comm.atty (247) | | 8,652. |
| 04/14/93 | M. Silverstein | Cred.Comm.atty (487) | 8,783. | 990. |
| 04/14/93 | Turner, Padget | Special counsel (474) | 3,502. | 446. |
| | | TOTAL: | $1,163,463. | $ 75,074. |

Two applications remain *sub judice* and are dealt with herein: (1) the Final Application for Fees and Expenses of the attorney for the Trustee, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. ("MLCFG & P") (Docket No. 484) in the amount of $139,256 for services and $11,216 in expenses; and (2) the Second Interim Application for Fees and Expenses of Joseph B. Garb, as "Post–Confirmation Trustee," (Docket No. 493) in the amount of $43,800 for services and $423 in expenses. The Official Unsecured Creditors' Committee objects to both applications, principally on the ground that the administrative fees and expenses generated in the case are too high, in light of the anticipated distribution to general creditors.

■ At the hearing, both the Trustee and his counsel kept noticeably clear of any discussion of their combined fee requests and total prior allowances, many of which *now* appear to have involved the rendering of excessive, unnecessary and duplicative services. Also, both drew a bright line between pre and post-confirmation services, arguing that the Court is without jurisdiction to revisit pre-confirmation fee awards. Although unique, we believe this argument is without merit, and for appellate purposes, rule that all *on account* compensation, pre and post-confirmation, is subject to final review at the completion of the case, when all of the results, claimed and actual, are in. *See Matter of Evangeline Refinery Co.*, 890 F.2d 1312, 1321 (5th Cir.1989) ("Because interim awards are interlocutory and often require future adjustments, they are '*always* subject to the court's reexamination and adjustment during the course of the case....'" *Id.* at 1321, citing 2 *Collier on Bankruptcy* ¶ 331.03 (15th ed.) (emphasis in original)); *see also In re Scoggins*, 142 B.R. 940, 943 (Bankr.D.Or. 1992).

Of the two requests presently before us, only MLCFG & P's is presented as a final application. Therefore, we shall consider it together with all previous applications, in determining the reasonable value of the services rendered by MLCFG & P as counsel to the Trustee in this case.

The Trustee, however, has not filed a final application. Instead, before us is Mr. Garb's "Second Interim Application" for the period January 1, 1992 through February 26, 1993. Thus our task with respect to the Trustee is to address only the present application (again, however, with previous allowances in mind).

I. *The Final Fee Application of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. in the amount of $139,256, and expenses of $11,216*

Based upon our review and consideration of: (1) the entries and narrative detail contained in all of the applications; (2) the time expended and the hourly rates charged; (3) the objections and comments of the Creditors' Committee and Signal Capital Corporation; (4) compensation previously allowed; (5) the results obtained; (6) the amount available for distribution to creditors; as well as all relevant factors under the lodestar analysis, *see In re Swansea Consol. Resources, Inc.*, 155 B.R. 28 (Bankr.D.R.I.1993), we find $420,000 to be the total reasonable compensation due MLCFG & P for services in this case.

With all of the oral and written embellishment aside, we make the following observations about the travel and conclusion of this case:

(1) Narragansett filed its Chapter 11 petition on February 5, 1990, as the Debtor in Possession of an operating business;

(2) Two months later, on April 5, 1990, Joseph Garb was appointed as the Chapter

Trustee, and he ran the business for approximately seven months, with the intention of selling it as a going concern;

(3) During that time a buyer, J.L. Sanford, was located and a two-stage sale of the business for $3.1 Million took place on November 21, 1990 and January 10, 1991. $1.67 Million was paid in cash at the closing, and notes of $1.39 Million were taken for the balance. The personal guarantee of the buyer's principal, Sanford Zimmerman, was also obtained by the Trustee, in the amount of $700,000;

(4) Several interim fee requests of Messrs. Garb and Norris (for MLCFG & P) were scheduled, heard, and determined, based on their representations that unsecured creditors would receive, over time, a substantial dividend approaching sixty-two percent (62%).[1] Early on in the case, the projected result was so good that in his application dated January 24, 1991, Mr. Garb requested a bonus of $76,145, "in recognition of the superior results obtained for the benefit of the unsecured creditors and complexity of the multiple successful negotiations necessary to conclude this case expeditiously."

(5) Within five months of the sale, however, J.L. Sanford was itself in bankruptcy, and the prospect of collecting anything on the balance of the purchase price became practically nil—i.e. J.L. Sanford is a no-asset bankruptcy case, and its principal, the guarantor of $700,000 of Sanford's debt to Narragansett, is allegedly insolvent and threatening bankruptcy himself. In short, the sale did not work out as planned, and the result, when compared with the early predictions, has been disastrous for creditors.

A major issue in considering the reasonableness of these fee applications, therefore, is the quality of the services and level of due diligence performed by the Trustee and his attorney regarding the J.L. Sanford sale and, after it went sour, the value of the time spent

investigating and trying to salvage what was left. In other words, after all of the narrative and detail provided by the Applicants as to their activities and accomplishments, the important question remains—how much have the services of Messrs. Garb and Norris benefitted this estate and its creditors? *See In re Lederman Enterprises, Inc.,* 997 F.2d 1321 (10th Cir.1993).

Based on the July 21, 1993 hearing on the Trustee's motion to approve the compromise of his claim against Sanford Zimmerman for $50,000, plus the acknowledgment that no dividend is expected from the Sanford bankruptcy, it is now obvious that many of these meticulously chronicled and categorized services have been of very little benefit to the estate. This is not to say that fees of professionals should be based solely upon results,[2] and we acknowledge that the outcome is only one of the factors to be considered in determining reasonable compensation. In this case, however, the spotlight is on achievement and result because it was in that context that the Applicants based their earlier requests, and it was likewise on the assumption of a quantified "job well done" that the Court made its prior awards. Accordingly, our inquiry is also based upon consideration of the following factors:

### A. *Due Diligence*

It is now clear, in hindsight, that the Applicant failed to perform adequate or reasonable due diligence during at least two critical periods in its representation of this estate, to the extent that a downward adjustment is required in the lodestar. It has become quite apparent that the pre-confirmation service devoted to investigating the substance of the J.L. Sanford offer was not time well spent, and that the demise of J.L. Sanford within five months of its celebrated sale indicates major shortcomings in the due diligence area,[3] for which creditors are now

---

**1.** This projected dividend covered unsecured creditors with claims of $4,000 or more. Creditors with claims of $100 or less, received payment in full at confirmation, and creditors with claims between $100 and $4,000 received a 50% payout of their claims at confirmation.

**2.** At least one Circuit Court *has* taken that additional step, however, holding that § 330(a) au-

thorizes compensation only for actual necessary services, and "that services cannot be necessary unless they are first beneficial." *In re Lederman Enterprises,* 997 F.2d 1321.

**3.** Counsel's attempt to place the blame on creditors for "voting to accept this offer" is not very persuasive. It was his duty to investigate, inform

faced with some very heavy legal/Trustee charges.[4] Equally disconcerting is the investment of additional, but similarly unproductive legal and trustee service investigating, this time, the collectability of the defunct J.L. Sanford indebtedness and Zimmerman guarantee.[5] Because of the absence of any discernible benefit to the estate for these post-confirmation activities, the maximum allowable compensation for these services is $10,000.[6]

### B. Signal Capital Litigation

■ Even a cursory review of the time charged to the Signal Capital matter reveals that excessive time was spent in relation to the amount in controversy. $125,000 was in dispute as to equipment leases, plus Signal's unsecured proof of claim in the amount of $378,884. MLCFG & P billed $41,345 for the period February 5, 1991 through November 30, 1991 for this litigation, and an additional $47,442 for the period December 1, 1991 through January 31, 1993, for a total of $88,787. This, added to the $12,475 requested by the Trustee, amounts to $101,262 in direct billing to the estate for this category. MLCFG & P's final application states that Signal's proof of claim was ultimately reduced for "a savings of $94,721 to the estate," but concedes that the estate did not recover *any* of the $125,000 letter of credit proceeds. The bottom line is that the compensation

requested by these two professionals to resolve this particular dispute exceeds the alleged "savings" by $6,541. In light of the negative benefit to the estate, all compensation is denied, except for the time it should reasonably have taken counsel and the Trustee to determine that one should not spend $101,262 to produce a "savings" of $94,721. Giving the Applicant the benefit of considerable doubt in this respect, for this exercise we will allow $10,000.[7]

### C. Hourly Rates

■ The standard in Rhode Island is the customary hourly rate charged for comparable service in the geographic area, not those currently being charged in Boston. *See In re Swansea Consol. Resources, Inc.*, 155 B.R. at 28. Although the Applicant may have received a different impression by this Court's summary treatment of its prior requests, we were being influenced heavily at that time by *expected* results, when the Applicant's projections were going pretty much unquestioned. Now that we know the outcome, which bears little resemblance to the early projections (which were in error by more than 100%), those earlier services may be evaluated much more accurately.[8]

■ Additionally, although the Applicant's blended hourly rate of $143.81 at first appears reasonable, included within it are the

and advise the creditors' committee and this Court of the risks in such a leveraged buyout, the success of which was so heavily dependent on the management ability and skill of the principal.

4. The combined charges of the Trustee and his counsel, for "the sale of Debtor's Assets" are $244,568, plus $153,205 for "reorganization efforts."

5. We find this second "due diligence" effort spent investigating the Zimmerman guarantee a true affront to creditors, considering counsel's recent admission that no serious financial expectation or reliance was ever attached to the guarantee, either before or after it was obtained. Combined charges of $107,742 were billed by MLCFG & P and the Trustee for this category.

6. This represents two full weeks of work (80 hours) at a blended rate of $130 per hour. If allowed as requested (384 hours), we would be approving nine weeks of billable time for this unproductive effort.

7. Although there are instances where professionals, even though unsuccessful, should be compensated for their efforts, here, where the time expended to litigate a dispute would likely exceed the benefit to the estate, it was their obligation to so advise the client. We find that the Applicants' unilateral decision to proceed, notwithstanding the deteriorating economic value of the claim, without notice to the "client" as to the probable outcome, was improper, ill advised, and therefore not compensable. These Applicants seem to have lost sight of the fact that *cost effectiveness* is relevant in bankruptcy, just as it is in the private/commercial sector.

8. This is the obvious advantage to having the actual results in before assessing the reasonableness of fees, but since this luxury is not available in protracted cases, where professionals are not required to wait until the conclusion of a case for payment, the next best available alternative is the procedure used in *Matter of Evangeline Refinery Co.*, 890 F.2d at 1321, *ante*.

paralegal charges, and certain billed rates not authorized in this jurisdiction (i.e. Attorney Mikels at $325 per hour; Miller [legal assistant] at $95 per hour). In *In re Swansea,* 155 B.R. 28, we approved $200 per hour as the top rate for experienced bankruptcy professionals, and $70 per hour as the uppermost rate for paralegals, for services rendered during roughly the same time.[9] Using these thresholds across the board, we will apply a blended hourly rate in this application of $130.

### D. *Computation of the Lodestar*

■ Lastly, we note that in this bankruptcy case there are approximately $5.1 Million in allowed claims, with approximately $3 Million in total assets. To date, professional fees and expenses of $1,238,537 (39% of the Estate) have been paid, with nearly $900,000 of that going to the Trustee and MLCFG & P.[10] MLCFG & P has requested over $720,000 in fees and expenses for its participation in the case, and has been paid, to date, $488,000. In the circumstances, the reasoning of the Court in *In re Gilead Baptist Church of Taylor,* 135 B.R. 38, 41 (Bankr. E.D.Mich.1991), *rev'd on other grounds,* 806 F.Supp. 644 (E.D.Mich.1992), becomes relevant:

> [t]he basis for considering the size of the estate in determining the reasonable professional fees lies in the very structure and premise of bankruptcy. It is fundamental that the bankruptcy process is for the benefit of the debtor and the creditors, not the professionals. If the fees are not reasonably proportionate to the size of the estate, the benefit shifts, as a practical matter, from the parties to the professionals.

The requests of these two professionals alone comprise over 42% of the assets in the Estate, an amount which we find to be greatly disproportionate and unacceptable in this case.

The reasonableness of time expended is an integral component of the lodestar analysis, and in this case we find there has been an extravagant expenditure of time in relation to: (1) the size of the case; (2) the complexity of the issues; and (3) the benefit of said services to the estate.

Our determination herein is also based upon various reductions in the total hours expended and as categorized by MLCFG & P:[11]

(1) Initial Procedural Matters—49.7 hours, or $8,954;

(2) Preference and Claims reduction (excluding Signal Capital)—1,457.1 hours, or $174,792.60;

(3) Signal Capital Litigation—538.7 hours, or $95,861;

(4) Postpetition Financing—24.3 hours, or $4,684;

(5) Assisting Trustee with interim and final fee applications—34.8 hours, or $5,880.50;

(6) General Assistance to Trustee—330.5 hours, or $56,578.50;

(7) Sale of Debtor's Assets—434.1 hours, or $86,768.50;

(8) Reorganization efforts—240.2 hours, or $40,797.50;

(9) Strategic Alternatives and Committee meetings—25.8 hours, or $5,860;

(10) Notices and Court hearings—188.5 hours, or $27,310;

(11) Preparation of fee applications—242.7 hours, or $34,376.50;

(12) Default—384.2 hours, or $74,017.

Total Hours in these Categories: 3,950.6.

While the separation of services into categories is helpful and often a required billing

---

9. Many of the services discussed herein were performed several years ago, when approved hourly rates were considerably lower than they are today.

10. It should also be noted that the firm of Winograd, Shine & Zacks, P.C., serving originally as attorney for the Debtor, then as special counsel to the Trustee, has received $205,370 in fees and expenses, based upon total requests of $238,453, and that counsel for the Creditors' Committee, has been paid $121,707 in fees and expenses.

11. The task of determining the number of hours which should reasonably have been spent on the services in question is obviously subjective and discretionary, but based upon this Court's long standing involvement in this case, and others, is one with which we are comfortable.

practice, the extent to which this Applicant has over-categorized, only highlights the degree to which the estate has been overcharged.

In accordance with the preceding discussion and rulings, we reduce by 1,480 the number of hours which should reasonably have been expended by the Trustee's counsel. At $130 per hour, the total allowable compensation comes to $322,000, plus expenses of $71,000.

Thus, in accordance with what we consider to be reasonable hourly rates in this jurisdiction and the amount of time which should reasonably have been expended by MLCFG & P as counsel to the Trustee, both pre and post confirmation, we conclude, resolving many doubts in its favor, that the maximum amount due MLCFG & P for services and expenses in this case is $420,000, as rounded. Crediting all amounts previously paid on account against this final award, MLCFG & P owes the estate $68,000, and judgment should enter accordingly.

## II. The Second Interim Application of Trustee Garb

Mr. Garb's Second Interim Application for Services as Post–Confirmation Trustee is for the period January 1, 1992 through February 26, 1993, in the amount of $43,800 and $423 in expenses. Upon consideration of this application and the arguments pressed vigorously and at length in his own behalf, we make the following findings, conclusions, and rulings:

### A. Hourly Rates

■ We will dispose of the most elementary matters first. Mr. Garb adamantly maintains that he must bill at the flat rate of $250 per hour because he is a sole practitioner, and therefore is not able to delegate lesser tasks to lower-priced associates and assistants (because there are none). We find it ludicrous for Mr. Garb to seriously contend that, because he elects to work all by himself, he is justified in billing $250 per hour for services that should have been delegated to paralegals, legal assistants, clerks, messengers, etc. Many of the tasks performed by the Trustee, such as the issuance of checks, maintenance of cash accounts, and compilation of information included in the fee application (23.5 hours) should have been charged at much lower rates. Since Mr. Garb has made clear that he does not intend to do so, it becomes our obligation to adjust his compensation as though he had. See In re Swansea Consol. Resources, Inc., 155 B.R. 28.

■ Alternatively, the Trustee argues that the hourly rate of $250 was "negotiated" with the Creditors' Committee, and therefore is not really subject to review by the Court, especially at this late stage. This argument is also without merit, and we remind all concerned that hourly rates may not be negotiated when a professional is being employed. See In re Erewhon, Inc., 21 B.R. 79, 80–81 (Bankr.D.Mass.1982) ("In a bankruptcy case, fees are not a matter of private agreement. Inherently, there exists a 'public interest' that 'must be considered in awarding fees.'").

Therefore, in accordance with our rulings in In re Swansea, $200 per hour is the highest amount we will approve for Mr. Garb's services in this case. This rate, however, needs to be further adjusted downward to cover services which should have been performed by lower priced personnel, at rates in the vicinity of $50–$70 per hour for paraprofessional and other assistance. Accordingly, Mr. Garb's fee will be calculated based on a blended rate of $160 per hour.

### B. Due Diligence

As discussed ante, no reasonable explanation has been forthcoming from Mr. Garb, either, as to why the $700,000 Zimmerman guarantee was deemed sound or acceptable initially, or what due diligence was undertaken to determine whether the guarantee was worth anywhere near its face value when taken.[12] Nevertheless, after the San-

---

12. In fact, based upon MLCFG & P's description of the steps taken after default to collect on the Zimmerman guarantee, and its concerns about AMEV Capital Corp.'s senior position against the personal assets of Zimmerman, we find that when the guarantee was taken reasonable due diligence had not been done to avoid such an unfortunate, but fairly predictable result. We

ford/Zimmerman defaults, $106,000 more in fees were generated by the Trustee and his counsel to collect $50,000 from Zimmerman, and to conclude that the $1.4 Million J.L. Sanford obligation was probably going to be worthless. Specifically, the Trustee is charging $33,000 to collect the $50,000 Zimmerman "settlement," and his counsel is charging $73,000 for the same task. Further comment as to the logic or reasonableness of these numbers is not necessary.

Based upon the entire record and the accomplishments of the Applicants, neither the Trustee nor his counsel have performed at levels of expertise even close to that reflected by the compensation they seek. Given, on final analysis, that the Zimmerman debacle itself would result in a net loss to the estate of over $50,000 [13] if fees were approved as requested, we decline to award the Trustee any compensation for time spent on this item.

### C. *Conclusion*

Based upon the foregoing discussion and rulings, and considering the substantial fees already received by the Trustee ($407,511), vis-a-vis the present anticipated distribution to creditors, we do not award any compensation at this time, but reserve final decision until the conclusion of the case. At the hearing on his final fee application, after consideration of all prior interim applications and allowances, both pre and post-confirmation, we will render a final order in accordance with the lodestar formula, based upon Mr. Garb's performance and the results obtained.

find this to be a serious shortcoming in performance by both the Trustee and his counsel, notwithstanding Mr. Garb's *repeated* assignment of blame to the Creditors' Committee "for doing the Zimmerman deal."

While this decision was in draft form, we heard the Trustee's motion to approve the Zimmerman compromise for $50,000. At that hearing, the Applicants *for the first time* announced that they did not rely upon Zimmerman's financial wherewithal when they accepted his personal guarantee in the amount of $700,000. We find their explanation (that the Zimmerman guarantee was not taken as security for the notes, but rather to "inspire" Mr. Zimmerman to perform as promised) to be naive at best, but more likely a disingenuous afterthought.

13. The real damage to the estate as a result of the due diligence failure, of course, is the failure of either J.L. Sanford or Mr. Zimmerman to satisfy the terms of their agreements with the Trustee, to the tune of $1.4 Million.