**In re ALMACS, INC., Debtor.**

**Bankruptcy No. 93–12090.**

United States Bankruptcy Court, D. Rhode Island.

Feb. 17, 1995.

Robert Lapowsky, Cohen, Shapiro, Polisher, Sheikman & Cohen, Philadelphia, PA, Edward Bertozzi, Steven Kumins, Edwards & Angell, Providence, RI, for debtor.

Joseph DiOrio, Hinckley, Allen & Snyder, Providence, RI, Joel D. Applebaum, Pepper, Hamilton & Scheetz, Detroit, MI, for Creditors' Comm.

Warren M. Petraglia, Ernst & Young, New York City.

Allan Shine, Winograd, Shine & Zacks, P.C., Providence, RI, for Supervalu.

Steven Ellis, Goodwin, Procter & Hoar, Boston, MA, for Lender/Bondholder Committee.

Office of U.S. Trustee, Sheryl Serreze, Providence, RI.

Matthew McGowan, Salter, McGowan, Swartz & Holden, Providence, RI, Adam Rogoff, Weil, Gotshal & Manges, New York City, for New Almacs, Inc.

Bruce Gladstone, Cameron & Mittleman, Providence, RI, for GECC.

Robert A. Jeffrey, McKenney, Jeffrey & Quigley, Providence, RI.

Robert Silva, Silva & Associates, Ltd., Middletown, RI.

James F. McAleer, McAleer & McAleer, Providence, RI.

## DECISION AND ORDER DETERMINING COMPENSATION AND REIMBURSEMENT OF EXPENSES

ARTHUR N. VOTOLATO, Bankruptcy Judge.

Heard on the fee applications of seventeen professionals who participated in this confirmed Chapter 11 case, and on objections filed by the United States Trustee, and Supervalu Operations, Inc. Left for determination [1] are the following eleven requests for fees and expenses: (1) Cohen, Shapiro, Polisher, Shiekman & Cohen ("Cohen Shapiro"), lead counsel to the Debtor—$623,651; (2) Edwards & Angell, local counsel to the Debtor—$422,325; (3) Alvarez & Marsal, consultants and interim managers of the Debtor—$1,756,909; (4) Pepper, Hamilton & Sheetz, counsel to the Official Unsecured Creditors' Committee—$303,333; (5) Hinckley, Allen & Snyder, local counsel to the Official Unsecured Creditors' Committee—$44,754; (6) Goodwin, Procter & Hoar, counsel to the Official Committee of Lenders and Bondholders—$507,471; (7) the Official Bondholders/Lenders Committee expense request—$52,281; (8) the Unofficial Bondholders/Lenders Committee expense request—$185,449; (9) Ernst & Young, accountants to the Official Committee of Lenders and Bondholders—$417,836; (10) KPMG Peat Marwick, accountants to the Debtor—$46,592; (11) Price Waterhouse, accountants to the

Official Unsecured Creditors' Committee—$260,834. The grand total of these applications is $4,717,389.

[blacked out] It was not until the conclusion of the fee hearing that we heard urgent pleas by several of the applicants for expedited determinations of their requests, because of fiscal year end requirements of their firms. We agreed to provide the professionals the bare numbers, with written reasons to follow, and advised that such expedited awards would probably be made *on account*.[2] Accommodating this request has not been easy. The resulting time constraints have placed unacceptable pressure on the Court, since the same amount of effort and scrutiny is required as if time were not of the essence. In addition, we have not been excused from performing regular and emergency Court business that requires daily attention. In the future, bankruptcy professionals with short compensation deadlines must make such needs known well enough in advance so that they do not become our top priority item, to the exclusion of everything else. Having said that, the reasons for our December 30, 1994 rulings are as follows:

## I. STANDARD OF REVIEW

[blacked out] As required, we have used applicable First Circuit guidelines in determining the pending fee applications described in *Furtado v. Bishop*, 635 F.2d 915 (1st Cir.1980), and applied in *In re Swansea Consol. Resources, Inc.*, 155 B.R. 28 (Bankr.D.R.I.1993); *In re Bank of New England Corp.*, 134 B.R. 450 (Bankr.D.Mass.1991), *aff'd*, 142 B.R. 584 (D.Mass.1992); and *In re 321 S. Main Street, L.P.*, 155 B.R. 41 (Bankr.D.R.I.1993). Specifically, we have set a blended hourly rate

---

**1.** On December 30, 1994, we approved the following five applications, as filed, totaling $86,520: (1) McKenney, Jeffrey & Quigley, counsel to Debtor in connection with self-insured workers' compensation program, fees of $24,684.50 and expenses of $80; (2) Keen Realty, fees of $30,035 and expenses of $26,566; (3) McAleer and McAleer, local counsel for Bondholder/Lender Committee, fees of $1,530; (4) Robert Silva, Esq., special counsel to Debtor regarding zoning issues, fees of $1,725; and (5) American Auctioneers and Appraisers, Inc., fees of $1,900. There was no objection to, or reduction of these applications, so the specific reasons for our action are

not included herein. They did, however, receive the same scrutiny required as to all applications for compensation.

**2.** By *on account*, in the context of this case, we mean compensation awarded in anticipation of, but before the value or benefit of the services is ascertainable. *On account* awards are *not* final, and are subject to review when the actual results are in, and/or when the benefit factor may be better evaluated. *See In re Narragansett Clothing Co.*, 160 B.R. 477, 479 (Bankr.D.R.I.1993).

for each applicant and then multiplied that rate by the time reasonably spent rendering the professional services, to arrive at a base award. To this figure, we have adjusted the lodestar (upward in this case) to reflect, as represented by the Applicants, the excellent results achieved.[3]

■ However, since nearly the entire purchase price consists of the unsecured promissory notes of a newly formed corporation, payable five to seven years in the future, we must also do our best to keep recent unpleasant history from repeating itself, *see In re Narragansett Clothing Co.*, 160 B.R. 477 (Bankr.D.R.I.1993) (In that case large interim fees were awarded based on anticipated results that never materialized, i.e., within five months of the sale of the Narragansett assets, but before payment of the $1.39 Million balance, the purchaser itself was in bankruptcy in the Southern District of New York.); *see also In re Narragansett Clothing Co.*, 175 B.R. 820 (Bankr.D.R.I.1995) (Order requiring disgorgement of $68,000 in fees previously awarded *on account.*) It has been noted on other occasions that "[i]t is fundamental that the bankruptcy process is for the benefit of the debtor and the creditors, not the professionals." *In re Gilead Baptist Church*, 135 B.R. 38, 41 (Bankr.E.D.Mich. 1991), *rev'd on other grounds*, 806 F.Supp. 644 (E.D.Mich.1992); *see also Narragansett Clothing Co.*, 160 B.R. at 482. Accordingly, the fees published in our expedited Order of December 30, 1994, are designated as *on account* awards to be reexamined at a status hearing on September 6, 1995, at 10:00 a.m., for the purpose of reviewing New Almacs' performance and projections after its first nine months of operation.[4]

### A. Hourly Rates

■ In *Swansea*, nearly two years ago, we approved $200 per hour as the top rate in this District for experienced bankruptcy pro-

fessionals, in complex cases. 155 B.R. at 32; *see also In re Narragansett Clothing Co.*, 160 B.R. at 481–83. In that case we were guided by the U.S. District Court decision in *Mokover v. NECO Enters., Inc.*, where Chief Judge Francis Boyle stated:

> One of the issues is not what are the plaintiffs' attorneys' usual and customary charges in the locality where they principally practice, but what is a reasonable charge in the locality where the services are rendered. If counsel choose to become involved in litigation in Rhode Island, it is the Rhode Island reasonable fees which obviously should apply.... It is this Court's clear perception that the current rate for a senior partner's services is in the range of $180 per hour. Associates should appropriately be allowed a maximum compensation of $125 per hour.

785 F.Supp. 1083, 1092 (D.R.I.1992); *see Swansea* at 32 n. 3. Consistent with *Mokover*, but taking into account the size and complexity of the Almacs' case, and also adjusting for inflation, we now rule that $275 per hour is the *maximum rate* for bankruptcy professionals appearing in this District.[5]

### B. Hours Reasonably Expended

■ The second prong of the lodestar analysis requires a determination of the number of hours *reasonably* expended to perform the services. *In re Casco Bay Lines, Inc.*, 25 B.R. 747 (Bankr.1st Cir.1982). In arriving at that number the court should consider the *Johnson* factors, to the extent that they are applicable, i.e.: (1) the time and labor required; (2) the novelty and difficulty of the question presented; (3) the skill required to perform the legal services; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by client or circumstances; (8) the

---

**3.** Without exception, each Applicant stressed, in support of their respective requests, "the extraordinary result," i.e., the sale of the Debtor's assets as a going concern for $33 Million, and the part each played in achieving the result.

**4.** This hearing is scheduled pursuant to the provisions of Article XI of the Debtor's Third Amend-

ed Plan, ¶¶ a, d, and f, 11 U.S.C. § 1142, and Fed.R.Bankr.P. 3020(d).

**5.** $275 per hour is not a new norm to be routinely applied henceforth, but is the *maximum* rate allowable for exceptional services in extraordinary cases.

amount involved and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; (12) awards in similar cases. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974); *see also King v. Greenblatt*, 560 F.2d 1024 (1st Cir.1977); *Swansea*, 155 B.R. at 31.

■ In addition, the number of hours *actually* worked by a professional does not automatically, or even necessarily equate to the hours which *should reasonably* have been expended, and it is this distinction that sometimes results in tension and disagreement between applicants and courts. Nevertheless, " '[e]ven without regard to objections by other parties in interest, the court has an independent judicial responsibility to evaluate professionals' fees.' " *Id.* quoting *In re Bank of New England Corp.*, 134 B.R. at 453 (other citations omitted).

C. *Revision of Certain Expense Standards*

(1) *Photocopies*

■ In *321 South Main*, we held that in-house photocopies were reimbursable at fifteen cents ($.15) per page. In so ruling, we considered Judge Hillman's 1991 decision in *In re Bank of New England*, as well as the charges of various providers, including copy houses and the Rhode Island State Law Library. Upon reexamination of this expense item, we feel that some increase is warranted to reflect today's increased actual cost, and now recognize twenty cents ($.20) per page as the current standard for in-house photocopying in this District.[6]

(2) *Facsimile Charges*

■ In *321 South Main*, we also ruled that telecopy (fax) expenses were reimbursable at the rate of fifteen cents ($.15) per

page. That item is also revised as follows: (1) outgoing telecopies will be allowed at the actual cost of the telephone call (*see Bank of New England*, 134 B.R. at 458); (2) if a professional does not maintain and submit accurate telephone logs of outgoing facsimile transmissions, $.15 per page will be allowed for outgoing telecopies; and (3) incoming telecopies will be allowed at the flat rate of $.20 per page.

II. *REVIEW OF THE SPECIFIC APPLICATIONS*

A. **Cohen Shapiro**—Request $623,651 [7]

(1) *Calculation of the Lodestar*

■ Cohen Shapiro reports a blended hourly rate of $194.15. This figure is incorrectly watered down, however, because it includes charges by para-professionals. While we approve whole-heartedly the use of paralegals and other para-professionals to the greatest extent possible to reduce more expensive attorney time, these charges should not be included when computing the hourly rates of professionals. Also, in *Swansea*, we established $70 per hour as the maximum rate for para-professionals, who are compensated separately from the nonbillable staff. 155 B.R. at 34. That figure remains unchanged. Paralegals Bayless and Nannelli both billed in excess of $70 per hour, and their charges are reduced, for a downward adjustment of $1,954. Recalculating the hourly rate based on the standards established above, the allowed blended hourly rate for Cohen Shapiro is $193.27.

■ The second element of the lodestar calculation is the reasonableness of the time expended, in relation to the services performed. We agree with the United States Trustee's comment that this application contains excessive and unjustified interoffice conferences. Approximately 238 hours were billed for such services, and while an attempt was made to explain the reasons for and

---

6. As in the past, we will continue to allow reimbursement at higher than standard cost, *if* adequate documentation of such higher actual cost is provided. What we may not permit, however, is the quiet operation of mini-profit centers by court appointed professionals. *See In re Ginji Corp.*, 117 B.R. 983, 995 (Bankr.D.Nev.1990).

7. Cohen Shapiro requests additional fees of $15,730, but the attached time records total $15,400. We have corrected the (arithmetic) error with a downward adjustment of $330.

necessity of some of these conferences, many were not shown to be reasonable or necessary. In light of the extensive time expended and the hourly rates charged, and because the reasonableness or necessity of such services has not been established, a percentage reduction of the time charged is needed. *In re Smuggler's Beach Properties, Inc.*, 149 B.R. 740, 745 (Bankr.D.Mass.1993); *see also Swansea*, 155 B.R. at 33. Using our independent judgment, as well as our familiarity with the facts of this case, we conclude that a fifty percent reduction for interoffice conferences is appropriate.[8]

In reviewing the time entries for paralegals, we see charges for many services that are clerical in nature and which should be treated as overhead. Such entries include: "organize file"; "review file"; "obtain information for ..."; "fax"; "prepare documents ..."; "telephone call to order transcripts"; "order docket." Based upon the frequency of this type of entry, we reduce the paralegal time by forty percent.[9]

We also have reduced the application by $15,330 for entries that do not sufficiently describe the work performed or the necessity of the service. For example, there are many entries that list a telephone conversation with an individual, but which fail to identify the subject matter or the reason for the conversation. Other entries say only "study/analyze documents," and "review documents." These descriptions are clearly inadequate to identify the services performed, and we have made an appropriate reduction on account of such entries.

### (2) *Adjustments to Expense Items*

#### (a) *Librarian and Secretarial Overtime*

The Applicant requests $193 for the use of a librarian. We deem this "expense," if that is a correct description, to constitute overhead, and not a proper charge against the estate. *See Bank of New England*, 134 B.R. at 455–56. Similarly, a $1,680 request for secretarial overtime is overhead, and is disallowed. *Id.* at 456; *see also 321*

*South Main*, 155 B.R. at 43. During the pendency of this case the Court imposed no unreasonable deadlines on the parties which would create a need for secretarial overtime. To the contrary, we usually asked the professionals to establish their own time parameters, so any deadlines requiring secretarial services after normal business hours were self-imposed by the Applicants, and should not be paid by the client.

#### (b) *Travel Expenses*

Cohen Shapiro, a Philadelphia law firm, requests $25,628 in travel expense reimbursement. Although it has not charged for travel time (per its agreement upon retention), we find that a 75% reduction for *all* travel expenses is required, in the absence of a showing that the service provided was unavailable more locally. On this point we follow *Bank of New England* again, that "professionals outside of the District might be compensated for 'external' travel time and *expenses* only if they provided a type of service not available on the local market; otherwise they would receive the same allowances for travel as would professionals based in the District." 134 B.R. at 464 (emphasis added).

At the beginning of Mr. Lapowski's December 16 presentation he indicated that evidence would be produced concerning the inability of the Debtor to obtain local replacement counsel, but such proof was not offered. The Court's recollection is that when the Debtor decided to discharge the Providence law firm Edwards & Angell as its lead counsel (the wisdom of which still escapes us), it was having trouble locating other Rhode Island lawyers equipped and qualified to handle a case of this magnitude and complexity. We respect the right of a client to hire counsel of its choice, but this does not entitle out of town professionals to reimbursement for *all* travel and travel related expenses, unless it is shown that qualified professionals located closer to Providence, as Boston, Hartford, Worcester, and Springfield, are not available. On the facts before us, we rule that Cohen Shapiro has failed to establish

---

8. 238 hours × ($193.27) = $45,998 × 50% = $23,000.

9. This results in a reduction of approximately 137 hours in paralegal time, for a total of $9,569.

that the services it provided were not locally available, and a seventy-five per cent reduction ($19,221), of all external travel expenses is ordered.[10]

#### (c) *Meals*—$949

■ The Applicant's request for reimbursement of $949 for meals is denied. Absent unusual circumstances, the cost of meals is a nonreimbursable item of personal overhead. *See Bank of New England,* 134 B.R. at 458;

#### (d) *Telecopy Charges*—$8,720

Cohen Shapiro charges $1.50 per page for outgoing faxes and does not charge for incoming telecopies. For the reasons discussed above, this request is reduced to $.15 per page;[11]

#### (e) *Document Production*—$1,322

■ Without further explanation we are not sure what this expense is for, but assume it relates to word processing, which is a nonreimbursable item of overhead. *Id.* at 456; *321 South Main,* 155 B.R. at 43;

#### (f) *Express Mail*—$2,460

■ The Applicant has not demonstrated emergency or special circumstances to justify the use of expedited mail service, and this expense is reduced by 75%.

#### (3) *Cohen Shapiro's On Account Award*

Based upon the foregoing analysis and discussion, and in accordance with the referenced authorities, we calculate the Cohen Shapiro lodestar as follows: The blended hourly rate of $193.27, multiplied by 2,589.51 (the number of hours reasonably expended), results in a base award of $500,475. To this figure we make an upward adjustment of five

percent (5%) in recognition of the anticipated excellent result claimed to have been produced by the Applicant. Thus, Cohen Shapiro is allowed compensation, ON ACCOUNT, in the amount of $525,498, and expenses of $39,936.

Considering the number of applications being dealt with in this Decision, and since many of the reasons and authorities for fee and expense adjustment will apply to the remaining applications as well, to the extent possible we will avoid repetitious discussion of individual fee and expense items below. Therefore, the foregoing rationale and authorities are incorporated by reference below, wherever appropriate.

Because of the contingent nature of the claimed result however, where the bulk of the purchase price consists of unsecured future promises of payment, Cohen Shapiro's fee, as well as those of all of the other applicants will be looked at again on September 6, 1995, in light of New Almacs' performance figures and projections to be provided at that time. Pursuant to Article XI of the confirmed Plan, ¶¶ a, d, f, as well as 11 U.S.C. § 1142, and Fed.R.Bankr.P. 3020(d), it is ordered that documents relevant to the September 6, 1995 inquiry be provided to the Applicants, the Court, the United States Trustee, and interested parties on or before August 30, 1995.

#### B. *Edwards & Angell*—Request $422,325

#### (1) *Consideration of Lodestar*

All but one hourly rate[12] billed by Edwards & Angell is within the accepted range in this District, and for purposes of calculat-

---

**10.** We have allowed 25% of Cohen Shapiro's external travel expenses because it has not charged for travel time, and we recognize that certain trips to New York and California to meet with the proposed purchasers and with Leonard Green & Partners would have been required, even if the firm was located in Rhode Island.

The Court may indulge a debtor, trustee, or committee desiring to retain professionals from outside of the district in a case which could be handled by local persons, but, generally speaking, it will not permit fees to be paid from the estate for travel time greater than those which would be incurred if the professional's office were within the district. *Bank of New England,* 134 B.R. at 454.

**11.** We have tried dividing the total cost of telecopies by $1.50 per page, but do not come up with a logical number. We have therefore rounded off this item (total estimated pages 5,813 × $.15 = $872), and assume the Applicant has miscalculated this expense.

**12.** Partner, Sandra Reimer, Esq., billed at $320 per hour, and her rate is reduced to $275.

ing the lodestar, E & A's blended hourly rate is $160.97.

The United States Trustee objects to E & A's request on the ground of lumping of various tasks, making it impossible to review for reasonableness, and also because of duplication of services with Debtor's lead counsel, Cohen Shapiro. E & A has filed a lengthy opposition to the United States Trustee's comments, arguing that the criticism is baseless. Upon review of the conflicting arguments, as well as an independent examination of the application and the objection, we find some merit in each position. Although not all of the tasks are lumped, certain ones are, especially those listing several conferences in a single entry. Moreover, in the two earlier E & A fee applications, there clearly is excessive billing for interoffice conferencing, to the extent that a ten percent (10%) reduction of the total hours billed is reasonable.

### (2) *Adjustments to Expense Items*

#### (a) *Para-professionals*

The United States Trustee objects to charges for certain para-professionals who usually would not qualify for separate billing. In this instance the Applicant has furnished a very detailed explanation of the services performed by these individuals, to show that the Debtor derived a quantifiable and cost effective benefit from their work. Based upon E & A's thorough description and justification of charges, the entries in the October 26, 1993, and March 1, 1994, invoices for J. O'Neill, M. Crisafulli, X. Waldron, M. Ames, and L. Frazao are allowed, in the amount of $4,622.

#### (b) *Telecopies—$2,598*

Applicant transmitted 5,195 pages at $.50 per page. Because it does not keep track of the actual cost of its telephone calls, we allow $.15 per page, and reduce the request by $1,818.

#### (c) *Federal Express—$511*

Applicant contends that it was under several time constraints, and used express mail only sparingly. We are satisfied with certain but not all of Edwards & Angell's explanations for using express mail, and conclude as we have with the other applicants, that much of the alleged urgency was self-imposed. Accordingly, we reduce this request by 50%, and allow Federal Express charges in the amount of $256.

#### (d) *Stationery—$127*

This request is disallowed as overhead.

#### (e) *Secretary Overtime—$950*

Also disallowed, as noncompensable overhead.

#### (f) *Meals—$193*

For reasons previously stated, this expense is disallowed.

### (3) *Edwards & Angell's On Account Award*

Based on a blended hourly rate of $160.97, multiplied by 2,218.24, the hours reasonably expended, E & A's base award is $357,070. To this, and again in reliance on the accuracy of the results proclaimed by the Applicant, we make an upward adjustment of five percent (5%), and allow E & A compensation, ON ACCOUNT, in the amount of $374,924, and expenses of $24,312.

## C. *Alvarez & Marsal* —Request $1,756,909

Alvarez & Marsal is the "turnaround" firm hired by the Debtor on August 31, 1993, shortly after filing its Chapter 11 petition. The firm assigned four full time staff people to this case, including Thomas Ireland ("Ireland") who headed up the consulting group and served as the Debtor's Chief Executive Officer from October 15, 1993, through confirmation.

### (1) *Consideration of Lodestar*

Alvarez & Marsal's hourly rates are higher than those customarily charged in this District. Mr. Ireland contends, nevertheless, that the firm's rates are comparable to those of other crisis management groups, and since there are no providers of similar services in the area, compensation should be at its regular rates. The firm bills $200 per hour for associates; $250 per hour for directors; and $300 per hour for Mr. Ireland. Ireland vol-

untarily reduced the rate for directors to $200 per hour, and billed at only half the customary hourly rate for travel time.

We disagree with the contention that the services provided by Alvarez & Marsal are not available within a reasonable distance from Providence. We have previously been required to consider fee applications of turn-around specialists from the Boston area and are familiar with their work and their hourly rates. *See Swansea*, 155 B.R. at 32. Therefore, local standards will apply to this fee request. Based on the quality of the services performed by Ireland and his group we allow: $170 per hour for associates; $200 per hour for directors; and $275 per hour for the services of Messrs. Ireland and Marsal.[13] This results in a blended hourly rate of $216.81.

### (2) *Adjustments to Expense Items*

#### (a) *Travel Time and Expense*—$160,354

 In light of our ruling that the Applicant's services are not unique to the local market, "external" travel time and expenses are disallowed.[14] Alvarez & Marsal argues that if it were a local firm it *might* still be entitled to reimbursement for some travel time and expense under *Bank of New England. See* 134 B.R. at 454–55, 457. We do not disagree with that statement, but since Alvarez & Marsal has not specified or described what those expenses might be, the request is DENIED.

#### (b) *Meals*—$12,574

Disallowed.

#### (c) *Miscellaneous Expenses*—$2,601

This item is not adequately documented and is disallowed.

### (3) *Alvarez & Marsal On Account Award*

Based on a blended hourly rate of $216.81, multiplied by 6,663.12, the hours reasonably expended on behalf of the Debtor, Alvarez & Marsal is allowed $1,444,631, plus five percent (5%) for achievement. This results in ON ACCOUNT compensation of $1,516,862, and expenses of $2,491.

### D. *Pepper, Hamilton & Scheetz*—Request $303,333

Pepper Hamilton is a Detroit law firm which served as counsel to the Official Unsecured Creditor's Committee.

#### (1) *Calculation of Lodestar*

At the outset, we note that Stuart Hertzberg, Esq., charges in excess of local standards, and that the services rendered by his firm in this case were not unique. Accordingly, his rate is reduced from $305 to $275 per hour. Additionally, the application is reduced by $1,379 for adjustments in paralegal charges that exceed $70 per hour, plus disallowance of the time billed for M. Makara, C. Fopeano, and M. Toombs, whose services appear clerical in nature.

 The firm charged for travel time and expenses, and since the services provided are available locally, all travel related fees and expenses are disallowed.[15] Joel Applebaum, Esq., argued that because his firm specializes in representing unsecured creditor committees in food industry insolvencies, it was able to develop a certain synergy among the various constituencies, which make its services "special." The existence and/or effect of any such synergy is not sufficiently tangible, in this Court's opinion, to justify the additional travel and related expenses of Detroit counsel. Based on these adjustments, the firm's blended hourly rate is $211.58.

 In addition, the time logged by this Applicant must be substantially reduced to equal the number of hours *reasonably* expended. We agree with the United States

---

**13.** Ireland billed 2,447.7 hours, and Mr. Marsal billed 33.4 hours at $300 per hour. Allowing $275 per hour reduces this part of the application by $62,028. Directors billed 2,472.2 hours at $200 per hour. Allowing $170 per hour, compensation is reduced by another $74,166.

**14.** This amounts to a reduction of $106,245 in fees and $54,109 in expenses.

**15.** The firm has charged for working and nonworking travel time. We disallow only nonworking travel time, in the amount of $4,057, and expenses of $15,497. The Applicant argues, as has Alvarez & Marsal, that it might be entitled to some compensation for travel time and expenses under *Bank of New England.* Here also, the Applicant has not sufficiently described what those time and expense items are.

Trustee's comment that Pepper Hamilton spent an inordinate amount of time on interoffice conferences, as well as charging for clerical tasks that are part of its overhead. While we recognize that interoffice conferences are necessary to coordinate the division and allocation of labor within a firm, and also between firms, the time charged by this Applicant for interoffice conferences (178 hours, or 13.9% of its time billed), is clearly excessive. Accordingly, we reduce the hours reasonably spent in conference by 50%.

■■■ We also agree with Supervalu's observation that "significant time was expended by counsel to negotiate the provisions of the plan relating to payment of the fees and expenses of Pepper, Hamilton & Sheetz, as litigation counsel who will handle the leveraged buyout litigation. These provisions include a minimum funding of $500,000 for legal fees to the firm and a bonus fee equal to fifty (50) percent of the time expended by the firm over $500,000, payable from any recovery from the leverage[d] buyout litigation." (Supervalu Objection, December 13, 1994, at 4. See also Third Amended Consolidated Chapter 11 Plan, at 37–39.)

Mr. Applebaum responded, disingenuously we think, by arguing at length that his firm was not counsel to the Litigation Trust ("yet"), and that his firm's retention was not assured. At page thirty-five of the disclosure statement, however, it is provided that: "It is anticipated that, subject to compliance with the Creditor Litigation and Distribution Trust, the Creditor Litigation and Distribution Trustee will be Arnold Zahn, counsel for such trustee will be Pepper, Hamilton & Scheetz. . . . " We do not share Mr. Applebaum's conservatism as to whether his firm will get that job.

Mr. Applebaum does correctly point out that it was necessary to negotiate the funding of the litigation trust in a manner that would convince the potential defendants that the leveraged buyout litigation is a viable, serious likelihood, and not merely a tactical but impotent threat. We agree, and recognize Pepper Hamilton's efforts on this account. Nonetheless, most of the time entries related to this issue were for the benefit of the Applicant, not the Estate, and do not meet the reasonableness standard under the lodestar test, i.e., time spent advancing its own interests, such as securing the job as counsel to the litigation trust and negotiating a guaranteed $500,000, plus substantial bonus provisions. The requested hours are reduced by 20% for this item.

Taking into consideration the above reductions, the number of hours reasonably expended by Pepper Hamilton in this case is 945.27.

(2) *Adjustment to Expense Items*

(a) *Telecopy*—$1,300

This item is reimbursable at $.15 per page, and the Applicant is allowed $195;

(b) *Meals*—$1,025

Disallowed.

(c) *Express Mail*—$371

The Applicant has not demonstrated emergency or special circumstances to justify the use of expedited mail, and this request is reduced by 75%.

(3) *Pepper Hamilton On Account Award*

Based on a blended hourly rate of $211.58, multiplied by 945.27, the hours reasonably expended, Pepper Hamilton's base award is $200,000. To this, in light of the anticipated result, we make an upward adjustment of five percent (5%) to the lodestar and award Pepper, Hamilton & Scheetz, ON ACCOUNT, compensation in the amount of $210,000, and expenses of $5,680.

E. *Hinckley, Allen & Snyder*—Request $44,754

(1) *Calculation of Lodestar*

The United States Trustee objects to this application primarily on the grounds: (1) that the hourly rates are above the standard established in *Swansea;* and (2) the request seems high in light of the nature and extent of services rendered as local counsel to the Official Unsecured Creditors Committee.

The hourly rates are in line with the standard announced herein, and while it is arguable that local counsel might have taken a more passive role, any excess would be de minimus in the total scheme of things in this case.

Taking into consideration the blended hourly rate, the hours reasonably expended, and an upward adjustment based on result, the application is allowed, ON ACCOUNT, as filed.

(2) *Adjustment to Expense Items*

(a) *Telecopy—$130*

Applicant charges $1 per page. We are unsure whether this is outgoing or incoming. $.15 per page, or $20 is allowed.

(b) *Express Mail—$37*

This item is reduced by 75% as unsubstantiated.

(3) *Hinckley, Allen & Snyder On Account Award*

The Applicant is allowed compensation, ON ACCOUNT, in the amount of $43,176 and $1,439 in expenses.

F. **Goodwin, Procter & Hoar**—Request $507,471

This law firm represented the Official Committee of Lenders/Bondholders, and prior to the formation of the Committee it represented several committee members. The Committee is made up of various lenders and bondholders whose claims total more than One Hundred Million Dollars.

(1) *Calculation of Lodestar*

■ Goodwin Procter's hourly rates exceed the maximum allowances referenced earlier in this decision, but contends that its regular rates should apply because they are in line with its home base—Boston. The firm also argues that it is one of very few firms specializing in "high yield debt" or "junk bonds," and therefore is entitled to its regular rate because there are no similarly qualified firms in Rhode Island. As to these contentions we rule: (1) that the Committee could have hired suitable counsel in the Rhode Island market; (2) that this Applicant's particular skills were not critical to the success of the case; and (3) that local standards will apply. Accordingly, the rates of

16. Applicant billed at one-half its normal hourly rates for travel time.

17. The application was reduced by $41,057 for adjustment of hourly rates. The Applicant reduced by 50% its normal hourly rates for travel

Attorneys Schneider, Clearly, Taylor, Whitledge, Pisa, Somers, Santucci, and Johnson are reduced to $275 per hour, resulting in a blended hourly rate of $236.09.

■ The Applicant has also billed the estate $6,236 for travel time incurred from its office in Boston to the Court in Providence.[16] The United States Trustee objects to the request for travel time, but this item comports with the guidelines in *Bank of New England,* 134 B.R. at 454–55, where the Court allowed local professionals to bill the estate at its full hourly rates for travel from the professionals' offices to the Court, as long as the travel was necessary and the rate reasonable. *Id.* at 454–55. The *Bank of New England* Court also noted that professionals from outside the District should not be *per se* ineligible for travel reimbursement, since their travel time to the Court may actually be less than that of a professional whose office is located within the District. *Id.* at 454 n. 5. Here, the Applicant traveled from Boston to Providence, which is probably the equivalent of a trip to Providence from Newport, Portsmouth, or Westerly.[17]

■ With respect to the reasonableness of the time expended, there is merit in Supervalu's objection regarding the benefit derived by the Estate from Applicant's services. Supervalu points out that:

the services rendered by Goodwin, Procter & Hoar as counsel to the Bondholders/Lenders Committee are grossly disproportionate to the benefits derived by the Debtor's Estates for such services.... Supervalu also believes that much of the services rendered were for the sole benefit of the Bondholders/Lenders Committee, and as such, should be borne by these creditors as a major creditor constituency and secured party, just as other major creditors have had to bear similar costs in protecting their claims during the pendency of the case.

time, and we order a further reduction for professionals charging in excess of $275 per hour. Such professionals' travel time is allowed at $137.50 per hour.

(Supervalu Objection, December 13, 1994, at 6–7.)

█ Goodwin Procter counters with the argument that, together with its accountant (Ernst & Young) they brought Victory Holdings, the ultimate purchaser, into the case and that but for their efforts in this regard the reorganization would not have succeeded. This is a large overstatement of the contribution of Goodwin Procter and Ernst & Young to the case. As Thomas Ireland explained, the grocery industry is a closely knit community; Almacs' troubles were widely known and well publicized in the trade journals and elsewhere; and, given a stabilized operation, potential buyers would emerge all by themselves. Victory would have come forward, at its own convenience, with or without Goodwin Procter's and Ernst & Young's assistance. In any event, even if these professionals did put Victory in touch with Almacs, this would not render *all* of their services reasonable or beneficial, and the traditional lodestar analysis would still apply. Goodwin Procter's most tangible accomplishment was to strike a deal with Victory that favored its own clients, *before* presenting this potential buyer to the Debtor. These services benefited the bondholders, *period,* and accordingly a twenty percent (20%) reduction in the total hours expended is required.

█ Finally, we order that the application be further reduced by $10,925 which the Applicant bills for future, anticipated services. Compensation for services may not be allowed until rendered *and* evaluated. 11 U.S.C. § 330(a)(1).

### (2) *Adjustment to Expense Items*

#### (a) *Telecopy—$6,852*

Applicant charges $1 per page and does not keep track of its long distance phone charges. We allow $.15 per page, for a total of $1,028.

#### (b) *Stenographic Overtime—$1,673*

Disallowed.

#### (c) *Federal Express—$1,202*

Reduced by 75%. Unsubstantiated.

#### (d) *Estimated Expenses—$2,000*

Expenses not actually incurred may not be allowed.

11 U.S.C. § 330(a)(1).

### (3) *Goodwin, Procter & Hoar On Account Award*

Based on a blended hourly rate of $236.09, multiplied by 1,387.70, the hours reasonably expended, Goodwin Procter's base award is $327,623. Again, based on the results presently anticipated, with an upward adjustment of five percent (5%), Goodwin Procter is allowed, ON ACCOUNT, compensation in the amount of $344,012 and expenses of $38,762.

On December 23, 1994, the Applicant filed a supplemental fee application. A ruling on that request is reserved until the United States Trustee has had the opportunity to comment.

### G. *Official Bondholders/Lenders Committee Request for Reimbursement of Expenses—Request $52,281*

█ The United States Trustee objects to this request on the grounds that it is not in proper form; it lacks sufficient documentation; and where it is supposedly documented, the text is illegible. We agree with all of these comments but more importantly, this Committee has not established that the expenses were incurred while making a "substantial contribution" in the case. *See* 11 U.S.C. § 503(b)(3)(D). Accordingly, the request is denied in its entirety.[18]

### H. *Unofficial Bondholders/Lenders Committee Request for Reimbursement of Expenses—Request $185,449*

The Unofficial Committee also has failed to establish that its expenses were incurred while making a "substantial contribution" in the case, 11 U.S.C. § 503(b)(3)(D), and we agree with the United States Trustee that the application is not adequately documented.

---

**18.** On December 30, 1994, we mistakenly allowed Citibank expenses in the amount of $961.27. That part of the December 30, 1994 Order is VACATED, and pursuant to the Plan Citibank is ordered to disgorge and to remit to New Almacs the sum of $961.27.

Accordingly, the request for reimbursement is denied.

## I. *Ernst & Young*—Request $417,836

### (1) *Calculation of Lodestar*

■ Ernst & Young performed accounting services from its New York office to the Official Bondholders/Lenders Committee. The services provided are not unique, and similar work could have been done by local professionals at local rates. The hourly charges range from $205 to $495 for managers, senior managers, and partners. All charges which exceed local standards are reduced to conform with Rhode Island rates,[19] resulting in a blended hourly rate of $194.13.

■ As for the reasonableness of the time expended, we agree with Supervalu's comment that, from the description of the services rendered by the Applicant it is difficult to make out a quantifiable benefit to the Estate. Like counsel to the Bondholders Committee, while Ernst & Young claims substantial credit for bringing Victory into the case, the beneficiaries of these services were its client, the bondholders. Based on our examination of the application, the specific time entries, and the Applicant's role in this case, we find that the time charged is excessive and order a reduction of twenty percent (20%) of the hours billed.

### (2) *Adjustments to Expense Items*

#### (a) *Travel*—$4,596

The Applicant did not provide a service unavailable in the local area. Therefore all external travel expense charges are disallowed.

#### (b) *Meals*—$1,299

Disallowed.

#### (c) *Express mail; messenger; research; telephone, supplies, and reference materials*—$2,311

These expenses are not adequately documented, and are disallowed.

### (3) *Ernst & Young On Account Award*

■ Based on a blended hourly rate of $194.13, multiplied by 1,521.05, the hours reasonably expended, Ernst & Young's base award is $295,281. While Ernst & Young's role in achieving the result in the case is far from clear, we recognize the subjective nature of the fee review process and make the same adjustment for result as we have with all of the other participating professionals. Thus, Ernst & Young is allowed, ON ACCOUNT, compensation in the amount of $310,046. The expense request is DISALLOWED entirely.

## J. *KPMG Peat Marwick*—Request $46,592

■ Upon review of this request, including the additional backup material provided by the Applicant, we find that the hourly rates charged exceed local standards, and that the Applicant has not provided a breakdown of each professional's hourly rate. We are therefore unable to determine the lodestar under traditional standards. Instead of denying the application, with leave to file an amended one, and in order to conclude the administration of the case, we adopt the United States Trustee's recommendation and reduce the entire fee request by six percent (6%). Peat Marwick is allowed, ON ACCOUNT, compensation in the amount of $43,796.

## K. *Price Waterhouse*—Request $260,834

### (1) *Calculation of Lodestar*

Price Waterhouse's hourly rates exceed local standards, they are reduced accordingly,[20] and the blended hourly rate is set at $173.09.

■ The requested hours are adjusted downward for: (1) excessive interoffice conferencing; (2) duplication of services with Ernst & Young; and (3) a basic failure to demonstrate that all of the services provided were reasonable and necessary. Overall, we find that the time spent is excessive in light of the benefit conferred. Price Waterhouse

---

19. Allowing $275 per hour for professionals and $70 per hour for para-professionals causes a reduction of $45,050.

20. Allowing $275 per hour for professionals and $70 per hour for para-professionals causes a reduction of $6,568.

was supposedly working in concert with Ernst & Young "to avoid duplication of their services." Together, their fee requests total over $670,000, and after examination of the application it is clear that the last thing these two accounting firms did was to avoid duplication.

We find that some of Judge Queenan's comments regarding Price Waterhouse's fee application in *In re Cumberland Farms, Inc.*, 154 B.R. 9, 11–13 (Bankr.D.Mass.1993), are applicable here. While one of the duties of Price Waterhouse as financial advisor to the Creditors' Committee is to monitor the Debtor, "[m]onitoring the Debtor does not give P[rice] W[aterhouse] a free license to involve itself in every minute aspect of the Debtor's business. P[rice] W[aterhouse] and the Committee must make an educated decision on which aspects of the case merit their heavy involvement." *Id.* at 12. Here the 1,440 hours requested is excessive and it is evident that the Committee and the Applicant did not make reasonable decisions as to which aspects of the case mandated their heavy involvement.

We are also concerned by Price Waterhouse's billing the estate for time spent securing, for itself, employment as Financial Advisor to the Litigation Trust. The real beneficiary of much of the time charged seems to be Price Waterhouse.

Finally, treatment of the unsecured creditors has not changed substantially from the initial proposal of a year ago. Because the Applicant has not established the benefit and/or the necessity of all of its services, a twenty percent (20%) reduction in the total number of hours expended is most reasonable.

*(2) Adjustments to Expense Items*

*(a) Telecopy—$1,048*

Applicant charged $3 for the first page transmitted, $1 per page thereafter, and did not keep track of long distance phone charges. In accordance with our earlier comments and rulings, $.15 per page is allowed for a total of $150.

*(b) Lodging—$256*

Because the Applicant's services are not unique to the local market, the request for "external" travel expense is denied.

*(c) Meals—$65*

Disallowed. *See, ante.*

*(d) Express Mail—$846*

Reduced by seventy-five percent (75%). Unsubstantiated.

*(3) Price Waterhouse On Account Award*

Based on these findings and conclusions, we rule as follows: blended hourly rate of $173.09, multiplied by 1,165.85 hours, results in base award of $201,797. As with all other professionals in this case who are being compensated in anticipation of projected results, an upward adjustment of five percent (5%) is awarded. Thus, Price Waterhouse is allowed, ON ACCOUNT, compensation in the amount of $211,889 and expenses of $3,135.

### III. *CONCLUSION*

The foregoing awards total $3,782,478 in fees and expenses. As stated above, however, due to our present inability to verify the alleged accomplishment, and to satisfy ourselves that the allowances, as made, have in fact been earned, we will await the results of the aforementioned status hearing on September 6, 1995, at 10:00 a.m., to evaluate the ability of New Almacs to perform, as projected, when the Plan was confirmed.